Argued and submitted February 2, affirmed July 5, 2007

M. M. KNEPPER
and J. J. Knepper,
*Plaintiffs-Respondents,*

*v.*

Timothy BROWN, M.D.;
Timothy Brown, M.D. PC.;
American Academy of Cosmetic Surgery;
and American Society of Lipo-Suction Surgery, Inc.,
*Defendants,*

*and*

DEX MEDIA, INC.,
fka U S West Dex, Inc.,
*Defendant-Appellant.*

Multnomah County Circuit Court
990302495; A128550

162 P3d 1026

Michael H. Simon argued the cause for appellant. With him on the briefs were Stephen M. Feldman and Perkins Coie LLP.

Kathryn H. Clarke argued the cause for respondents. With her on the brief was Gregory A. Smith.

Before Edmonds, Presiding Judge, and Wollheim and Ortega, Judges.

EDMONDS, P. J.

**EDMONDS, P. J.**

Defendant Dex Media, Inc. (Dex) appeals a judgment entered after a jury returned a verdict in favor of plaintiff M.M. Knepper on her claims of fraud and conspiracy to commit fraud and plaintiff J.J. Knepper on his claim for loss of consortium. Plaintiffs' claims are based on allegations that Dex published a Yellow Pages advertisement that misrepresented the qualifications of a physician who negligently performed liposuction surgery on M.M. Knepper (Knepper). On appeal, Dex contends that there is no evidence that its misrepresentation caused the injury that Knepper suffered. For the reasons that follow, we affirm.

## I. FACTS

Because the jury found in favor of plaintiffs, we state the facts in the light most favorable to them. *Boothby v. D. R. Johnson Lumber Co.*, 341 Or 35, 38, 137 P3d 699 (2006). In late 1996 or early 1997, Knepper was considering liposuction surgery and reviewed the Yellow Pages to identify plastic surgeons capable of performing the procedure. Knepper looked under the "Surgery—Plastic & Reconstructive" section of the Yellow Pages, hoping to find a "board certified" plastic surgeon.

Dr. Timothy Brown was one of the doctors who advertised in the "Surgery—Plastic & Reconstructive" section. His advertisement stated that he was "board certified." Believing that Brown was board certified as a plastic surgeon, Knepper added Brown's name to her list of possible surgeons.

In September 1997, Knepper attended a Women's Show that included informational booths on consumer goods and services, including liposuction. Knepper saw Brown's booth and recognized his name from the list of surgeons she had compiled from the Yellow Pages. Knepper had a conversation with Brown's office manager, who was staffing the booth, and was told that Brown was a board-certified plastic surgeon. Two months later, when Knepper went to Brown's office, she was told by Brown himself that he was a board-certified plastic surgeon.

Ultimately, Brown performed surgery on Knepper in 1997. Problems developed immediately after the surgery, and Brown attempted two further surgeries to repair the damage. The surgeries left Knepper with what one expert witness described as an "uncorrectable disaster."

As it turned out, Brown was not a board-certified plastic surgeon. He was certified by the American Board of Dermatology and was board certified in clinical and anatomical pathology. However, he did not have board certification in any surgical specialty. In fact, his training included a rotation through plastic surgery during his residency and approximately 18 days of informal training in liposuction.

Knepper offered evidence that Dex published Brown's advertisement with the knowledge that he was not board certified in plastic surgery. Steve Mueller, a Dex advertising consultant, helped Brown's assistant, Sara Newman, develop a "mock up" of the "board certified" advertisement. Newman told Mueller that Brown was interested in attracting more cosmetic patients, particularly liposuction candidates. Mueller suggested that the "plastic and reconstructive surgery" section was the best place to advertise, and that the advertisement should say that Brown was "board certified." Newman, however, expressed concern to Mueller that the "board certified" statement would be misleading under the "plastic and reconstructive surgery" heading because Brown was "not a plastic surgeon, board certified or otherwise[.]" Mueller, however, "pushed toward just saying 'board certified' in the ad because patients were expecting a plastic surgeon to do these techniques." Ultimately, the Yellow Pages advertisement represented that Brown was "board certified," without further qualification.

## II.  PROCEDURAL HISTORY

Initially, Knepper filed claims against Dex for damages based on theories of negligence, fraud, and conspiracy to commit fraud. Dex moved for summary judgment on those claims on a number of alternative grounds, including the argument that Knepper could not demonstrate a sufficient causal nexus between the alleged misrepresentation and the alleged injury that resulted from the liposuction. The trial

court, without explanation, granted the motion. Knepper appealed, arguing that none of the three grounds urged by Dex was independently sufficient to sustain the trial court's ruling. On appeal, we agreed with Knepper and reversed the judgment dismissing the claims of fraud and conspiracy to commit fraud. *Knepper v. Brown*, 182 Or App 597, 50 P3d 1209 (2002).

After our remand, plaintiffs' claims were tried to a jury. At the close of evidence, Dex filed a written motion for a directed verdict on a number of grounds. The court denied the motion, and the claims went to the jury. However, the jury ultimately deadlocked, and the court declared a mistrial.

In February 2005, the parties proceeded to trial for a second time. At the close of evidence, Dex again moved for a directed verdict and, once again, the trial court denied the motion. The jury returned its verdict in favor of both plaintiffs in the amount of $1,581,000. The trial court then reduced the verdict by $175,000, the amount of plaintiffs' settlement with Brown. Dex filed motions for judgment notwithstanding the verdict and for a new trial, but the court denied the motions. This appeal followed.

### III. ISSUES ON APPEAL

On appeal, Dex raises a number of assignments of error that focus on a single issue: Did Knepper prove the necessary causal link between her injury and Dex's misleading advertisement? For the reasons that follow, we affirm the judgment of the trial court.

■ In its first assignment of error, Dex argues that the trial court should have directed a verdict in its favor because "there was no evidence that Dex could reasonably have foreseen when it published Brown's Yellow Pages advertisement that Brown would be negligent in performing liposuction, which was the standard required by the trial court's jury instruction to which plaintiffs did not object." In response, Knepper first argues that Dex never made a motion regarding the "reasonable foreseeability" of medical negligence and therefore cannot advance that argument on appeal for the first time. ORAP 5.45.

At the close of the second jury trial, Dex's counsel made an oral motion for a directed verdict. He stated:

"Now, with respect to all of [the claims at issue], Your Honor has heard arguments on those claims, and so I'm going to try to go through them quickly and just preserve our points, preserve our points. But if there's any further explanation or clarification you would like about any particular point or argument, just let me know."

In response, the court stated, "I only ask you be brief but not quick for the sake of both myself and the reporter." At that point, plaintiffs' counsel stated, "I would stipulate to receipt into evidence of all of Mr. Feldman's argument, incorporating by reference his prior arguments and memoranda on this, so that we can get through this." In an abundance of caution, counsel for Dex responded, "I will incorporate all those by reference, and I thank you counsel, but at the same time I'm also going to just get my points on the record because I am not positive that those can be incorporated by reference in a new trial." In summarizing his points, he argued:

"Based on the evidence adduced at this trial, Dex believes that it is entitled to a directed verdict on the direct fraud claim because there is no evidence that Dex intended Dr. Brown's ad to mislead. Dex believes that there is not clear and convincing evidence that any reliance on Dr. Brown's ad was reasonable. Dex believes there is no evidence that Ms. Knepper was damaged as a result of any reliance on Dr. Brown's ad."

Those arguments were drawn from the bolded headings in the written motion that Dex had submitted at the close of the first trial. In the written motion, Dex specifically argued that "it was not and could not have been reasonably foreseeable to Dex that publishing Brown's Yellow Pages ad would result in his committing medical malpractice against a reader of that ad."

■   Whether an issue is preserved for purposes of appeal under ORAP 5.45 depends, in part, on fairness to the parties in raising and responding to the issue and on whether the trial court is afforded an opportunity to rule on the issue and thus avoid error. *Peiffer v. Hoyt*, 339 Or 649, 656, 125 P3d 734 (2005). Plaintiffs' counsel invited Dex's counsel to incorporate

his previous written arguments, which he did; the court was familiar with the arguments and asked counsel to be brief; and Dex's counsel made an oral motion that was consistent with a more developed and specific written motion that specifically referenced the issue of foreseeability. We conclude under the circumstances that the issue raised by Dex on appeal was preserved in the trial court as required by ORAP 5.45.

■        We turn, then, to the merits of Dex's arguments. Dex contends that the overarching question in this case is whether "Dr. Brown's negligent performance of a liposuction on Knepper, or anyone else for that matter, is a 'reasonably foreseeable' consequence of Dex's publication of Brown's yellow pages ad in the manner that it was published." According to Dex, it is not enough that a reasonable juror knows that a physician may be negligent; rather, Knepper was required to produce specific evidence that Dex placed her in "a greater risk of harm than generally accompanies a visit to a doctor."

Knepper offers a number of arguments in response, including that foreseeability is not even an element of a fraud claim or an aspect of causation. According to Knepper, foreseeability of harm is an element of a *negligence* claim; her claims are for fraud and conspiracy to commit fraud. We need not resolve that question, however, because, assuming that foreseeability of harm is an element of actionable fraud, as Dex asserts, the damages suffered by Knepper were a foreseeable consequence of Dex's misrepresentation.

In accordance with how Dex has framed the issue on appeal, the question posed by Dex's first assignment of error is whether Knepper offered any evidence from which the jury could have concluded that her injuries reasonably could have been expected to follow from Dex's misrepresentation. *See Boothby*, 341 Or at 40 n 2 ("We review the denial of a motion for a directed verdict for any evidence to support the jury's verdict."). As stated above, we view the facts and all reasonable inferences drawn from them in the light most favorable to Knepper, the prevailing party at trial. *Id.* at 38.[1]

---

[1] Dex contends that we must apply a "clear and convincing" standard in reviewing the denial of a motion for a directed verdict in a fraud case rather than the "any evidence" standard. We have stated that the clear and convincing

According to Dex, the undisputed evidence, viewed in the light most favorable to Knepper, established that Dex knew:

> "(1) Dr. Brown was a licensed medical doctor (M.D.) who had been in practice for a number of years; (2) Dr. Brown was a board certified dermatologist; (3) Dr. Brown had received liposuction training; (4) Dr. Brown had been performing liposuction for some period of time before the ad at issue was published; and (5) throughout the United States, including Oregon, other licensed medical doctors besides plastic surgeons, including especially dermatologists, competently and lawfully performed liposuction on an outpatient basis in a doctor's office."

In response, Knepper argues, alternatively, that (1) a jury needs no specific evidence to conclude that a misrepresentation regarding a service provider's qualifications can lead to loss or injury that probably would not have occurred if the qualifications were as represented, and (2) even if such specific evidence is necessary, she offered evidence through the testimony of Dr. Hale regarding the connection between "board certification" and Brown's malpractice.

As noted above, one of Brown's own employees voiced concern to Dex about the fact that Brown was "not a plastic surgeon, board certified or otherwise[.]" That alone is persuasive evidence that certain risks of misrepresenting Brown's qualifications were not only foreseeable; they were *foreseen*. Arguably, a jury could infer, based on that evidence, that a reasonable person would have recognized the potential for malpractice that could result from misrepresentations regarding the credentials of a surgeon. However, in this case, there is additional evidence that linked the risk of malpractice to Brown's lack of board certification in plastic surgery.

---

standard of proof "relates to how a jury weighs the evidence, not to how a trial court assesses the capability of the evidence to establish facts." *Faber v. Asplundh Tree Expert Co.*, 106 Or App 601, 606, 810 P2d 384, *rev den*, 312 Or 80 (1991); *see also Bolt v. Influence, Inc.*, 333 Or 572, 578 n 2, 43 P3d 425 (2002) (rejecting the suggestion that the Supreme Court had approved a "clear and convincing" evidentiary standard when reviewing a motion for a directed verdict with respect to punitive damages).

Hale, a board-certified plastic surgeon, testified regarding the significance of board certification to the injuries suffered by Knepper. He explained that dermatology is not a surgical specialty and does not involve surgical training. A "board-certified" plastic surgeon would have received four years of medical school education, a first year of residency, four or five years of general surgery residency, and then two more years of plastic surgery training. After that, a surgeon must take written and oral examinations and receive a recommendation from the American Board of Plastic Surgery before becoming "board certified" in that specialty. Hale testified that, "generally if you add the two boards written and orals, it is probably 25 to 30 percent fail rate" for getting board certified as a plastic surgeon. In addition, Hale testified that he had never seen a board-certified plastic surgeon commit the type of malpractice that occurred in this case.

Based on the above evidence, the jury could have inferred that board-certified plastic surgeons generally are more qualified to perform liposuction surgery than surgeons who are not board certified in that specialty. That is, the jury could have inferred that the representation that someone is "board certified" in plastic surgery is directly related to his or her competency as a plastic surgeon and bears a direct relationship to the likelihood that the surgeon will commit malpractice. Based on Hale's testimony, the concern expressed by Newman, and the nature of the misrepresentation at issue in this case, the jury could have found that an injury arising from malpractice by Brown was a foreseeable consequence of Dex overstating his qualifications to perform surgery.

Nonetheless, Dex relies heavily on the fact that the evidence is undisputed that, in general, dermatologists routinely and competently perform liposuction surgery. Of course, the jury was entitled to consider that evidence regarding the issue of causation. But it does not necessarily follow from that evidence that the risk of harm in this case was unforeseeable. The jury could have found from the evidence that Knepper sought to have the surgery performed by a board-certified plastic surgeon and relied on Dex's representation to that effect. It could also have inferred, based on Hale's testimony, that the malpractice would not have

occurred had Brown been board-certified in plastic surgery. Thus, the injury that occurred is within the foreseeable risk of harm that a reasonable person could expect to result from the type of misrepresentation made in this case. Accordingly, the trial court did not err in denying Dex's motion for a directed verdict on the issue of foreseeability.

In its second assignment of error, Dex contends that the trial court erred in denying its motion for judgment notwithstanding the verdict, for the same reasons that it advances under its first assignment of error. Our reasoning regarding the first assignment of error makes it unnecessary to address Dex's second assignment of error.[2]

In its third assignment of error, Dex contends that the trial court failed to adopt the liability standard set forth in *Goldstein v. Garlick*, 65 Misc 2d 538, 542, 318 NYS2d 370, 374 (NY Sup Ct 1971). According to Dex, *Goldstein* sets forth a heightened standard for liability of publishers for false advertisements and requires a plaintiff to prove that a publisher acted "maliciously or with intention to harm another or in reckless disregard of the consequences[.]" *Id*. Dex argues that such a standard is mandated by constitutional considerations regarding freedom of speech and freedom of the press and should be adopted in Oregon by this court. We need not decide whether such a standard is required under Oregon law; even if it is, a jury could properly find that Dex acted recklessly in light of Newman's statements to Mueller.[3]

In its fourth assignment error, Dex contends that the trial court erred in failing to grant a directed verdict on the ground that Knepper's injury was not the "direct result"

---

[2] Dex argues that, although we have stated that the denial of a motion for judgment notwithstanding the verdict is not reviewable, *e.g., Iron Horse Engineering v. Northwest Rubber*, 193 Or App 402, 415, 89 P3d 1249, *rev den*, 337 Or 657 (2004), we have on occasion reviewed such rulings, *e.g., Brown v. Washington County*, 163 Or App 362, 375, 987 P2d 1254 (1999), *rev den*, 331 Or 191 (2000). We need not resolve that issue in this case.

[3] Moreover, Dex appears to ask us to consider the applicability of the *Goldstein* standard only in the event that we conclude that foreseeability is not an element of a fraud claim. Dex states that, "[i]f this Court agrees with Dex that Oregon's common law of fraud requires evidence of foreseeability, then there is no need for the Court to consider whether any further protections are needed for publishers of advertisements." Here, we have assumed, as the predicate for our analysis, that foreseeability of harm is required.

of her reliance on Dex's misrepresentation. In its fifth assignment of error, Dex claims that the trial court erred when it denied Dex's motion for a new trial based on the trial court's refusal to give an instruction to the effect that Knepper's injury must be a "direct result" of her reliance on Dex's misrepresentation. *See Oksenholt v. Lederle*, 294 Or 213, 223, 656 P2d 293 (1982) ("Damages properly recoverable in an action for intentional misrepresentation are those which are a direct and necessary result of defendant's acts or omissions."). Nonetheless, Dex conceded at oral argument that the "reasonable forseeability" and "direct result" tests are simply alternative ways of describing the same test for legal causation in fraud cases under Oregon law.[4] For purposes of deciding this case, we agree.[5] In light of Dex's

---

[4] During oral argument, counsel for Dex was asked whether "[d]irect cause is simply another way, in your view, of describing reasonable foreseeabilty." Counsel responded,

"Exactly. And frankly, either one would have been satisfactory in this case. We did ask for a jury instruction consistent with [UCJI] 42.01 for direct cause. But there also is a great deal of discussion and dialogue with the trial court about the idea of reasonable foreseeability, and the trial court thought it more appropriate to instruct on reasonable foreseeability."

On rebuttal, Dex's counsel continued to focus on the issue of foreseeability and did not attempt to draw any distinction between "direct" cause and reasonable foreseeability.

[5] Over the years, Oregon courts have used a number of formulations to describe the elements of fraud. *See, e.g., In re Brown*, 326 Or 582, 595, 956 P2d 188 (1998); *Riley Hill General Contractor v. Tandy Corp.*, 303 Or 390, 405, 737 P2d 595 (1987); *Conzelmann v. N.W.P. & D. Prod. Co.*, 190 Or 332, 350, 225 P2d 757 (1950); *Wheelwright v. Vanderbilt*, 69 Or 326, 328, 138 P 857 (1914). In earlier cases, *e.g., Conzelmann*, the elements included the notion of "proximate" cause, which, in the negligence context, the court has "erased * * * from the lexicon in favor of foreseeability." *Buchler v. Oregon Corrections Div.*, 316 Or 499, 509 n 6, 853 P2d 798 (1993). In *Criqui v. Pearl Music Company*, 41 Or App 511, 517-18, 599 P2d 1177, *rev den*, 288 Or 173 (1979), *Oksenholt v. Lederle Laboratories*, 51 Or App 419, 432-33, 625 P2d 1357 (1981), *aff'd as modified*, 294 Or 213, 656 P2d 293 (1982), and *Caldwell v. Pop's Homes, Inc.*, 54 Or App 104, 117, 634 P2d 471 (1981), we described causation in the context of fraud cases as including an aspect of foreseeability and held that damages are limited to those which might reasonably be expected to follow from the character of the misrepresentation itself. A number of treatises have similarly intertwined issues of causation and foreseeability in the fraud context. *See* W. Page Keeton, *Prosser and Keeton on the Law of Torts* 767 (5th ed 1984) ("Furthermore, the consequential or special damages must have been proximately caused by the fraudulent conduct. In general and with only a few exceptions, the courts have restricted recovery to those losses which might be expected to follow from the fraud and from events that are reasonably foreseeable." (Footnotes omitted.)); *Fraud and Deceit*, 37 Am Jur 2d § 281 (2001) ("To establish the causation necessary between the fraud and the loss, it must appear in an appreciable sense that the damage flowed from the fraud as the proximate, and not the remote, cause; the damage must be such as is the natural and probable

concession, and the fact that the jury was instructed on the issue of foreseeability of Brown's negligence, we do not understand how instructing the jury that Knepper's injury must have been a direct result of Dex's misrepresentation could have affected the outcome of the case. Accordingly, we reject Dex's fourth and fifth assignments of error without further discussion.

Dex's sixth assignment of error pertains to Knepper's husband's derivative claim for loss of consortium and is entirely dependent on our resolution of Knepper's claims. Because we have rejected Dex's assignments of error regarding Knepper, we reject the sixth assignment of error as well.

Affirmed.

---

consequence of the fraud. * * * Although the fraud does not cause substantial damage apart from the happening of subsequent events that reasonably may be expected to happen, if these do happen the defendant is chargeable with the natural consequences of his or her act." (Footnotes omitted.)); *Restatement (Second) of Torts* § 548A (1977) ("A fraudulent misrepresentation is a legal cause of a pecuniary loss resulting from action or inaction in reliance upon it if, but only if, the loss might reasonably be expected to result from the reliance.").