Argued and submitted June 3, decision of Court of Appeals and judgment of circuit court affirmed October 9, 2008

M. M. KNEPPER
and J. J. Knepper,
*Respondents on Review,*

*v.*

Timothy BROWN, M.D.;
Timothy Brown, M.D. P.C.;
American Academy of Cosmetic Surgery;
and American Society of Lipo-Suction Surgery, Inc.,
*Defendants,*

*and*

DEX MEDIA, INC.,
fka U S West Dex, Inc.,
*Petitioner on Review.*

(CC 9903-02495; CA A128550; SC S055155)

195 P3d 383

Michael H. Simon, of Perkins Coie LLP, Portland, argued the cause and filed the brief for petitioner on review.

Kathryn H. Clarke, Portland, argued the cause and filed the brief for respondents on review. With her on the brief was Gregory A. Smith, Salem.

H. Scott Althouse, Washington, D.C., filed the brief for *amicus curiae* Yellow Pages Association.

Before, De Muniz, Chief Justice, and Gillette, Durham, Balmer, Walters, and Linder, Justices.**

GILLETTE, J.

---

** Kistler, J., did not participate in the consideration or decision of this case.

## GILLETTE, J.

In this common-law fraud action, plaintiffs obtained a $1.5 million jury verdict against Dex Media, Inc. (Dex), based on Dex's involvement in creating and publishing a Yellow Pages advertisement that misrepresented a doctor's qualifications. On appeal, Dex argued that plaintiffs presented no evidence that the misrepresentation caused the injuries that plaintiffs claimed (pain and physical deformities resulting from a botched liposuction procedure) and that it therefore was entitled to a directed verdict or to a judgment notwithstanding the jury's verdict. The Court of Appeals disagreed and affirmed the judgment for plaintiffs. *Knepper v. Brown*, 213 Or App 598, 162 P3d 1026 (2007). We allowed Dex's petition for review and, for the reasons that follow, now affirm the decision of the Court of Appeals and the judgment of the trial court.

Because Dex challenges the trial court's denial of a motion for a directed verdict, we consider (and describe) the evidence, and the reasonable inferences that may be drawn therefrom, in the light most favorable to plaintiffs—the parties opposing the motion. *Allen v. County of Jackson County*, 340 Or 146, 149, 129 P3d 694 (2006).

Dr. Timothy Brown is a licensed medical doctor who holds certifications from the American Board of Medical Specialties in dermatology and anatomic and clinical pathology. Brown started a dermatology practice in Oregon in 1985 and thereafter maintained an advertisement in Dex's Yellow Pages directory, under the heading "Physicians and Surgeons" and the subheading "Dermatology (skin)." The advertisement listed various services and prominently noted that Brown was "Certified by the American Board of Dermatology."

In 1993, Brown began to offer "tumescent" liposuction in his office, after receiving some limited informal training in how to perform that procedure. He mentioned the new service in his 1993-94 Yellow Pages advertisement, which still appeared under the "Dermatology" subheading and which still referred to his board certification in dermatology.

In 1996, Brown placed a second advertisement in Dex's Yellow Pages—this time under the subheading "Surgery, Plastic and Reconstructive." The new advertisement stated that Brown performed liposuction, wrinkle treatments, and sclerotherapy. It also stated that Brown was "Board Certified"—without specifying any area of certification.

The new advertisements were added at the urging of a Dex sales representative, Mueller. Brown's office manager, Newman, told Mueller that Brown was interested in attracting more liposuction patients. Mueller met with Newman to help her "mock up" a new advertisement. Mueller told Newman that the "plastic and reconstruction surgery" subheading in the Yellow Pages would be the best place to reach that target market. Mueller also told Newman that the advertisement should identify Brown as "board certified," because "patients were expecting a [board certified] plastic surgeon to do these techniques." Newman repeatedly told Mueller that she was concerned that such an advertisement would be misleading, because Brown's board certification was in dermatology, not plastic and reconstructive surgery. Mueller continued to push for a nonspecific "board certified" designation under the "Surgery, Plastic and Reconstructive" subheading, and Brown, who had the final say, acceded to Mueller's advice.

Early in 1997, plaintiff M. M. Knepper[1] was considering cosmetic liposuction surgery. She knew that she wanted to be treated by a plastic surgeon. She consulted the "Surgery, Plastic and Reconstructive" subheading in the Yellow Pages and compiled a list of doctors and medical facilities that performed liposuction. Knepper saw Brown's advertisement and included his name and telephone number on her list, believing him to be a plastic surgeon because of the location of his ad and the "board certified" designation that appeared after his name. Knepper did not call Brown's office at the time, however.

Some months later, Knepper attended a Women's Show and stopped at a booth offering information about

[1] Plaintiffs are Knepper and her husband.

Brown's cosmetic surgery practice. Knepper recognized Brown's name from her list of potential plastic surgeons. She picked up a brochure, which stated that Brown was board certified in, among other things, "Dermatologic Surgery." One of Brown's employees, who was manning the booth, told Knepper that Brown was a board-certified plastic surgeon. Knepper thereafter made an appointment to discuss lipo-suction with Brown. At the consultation, Brown also told Knepper that he was board certified in plastic surgery.

Knepper decided to retain Brown, and he performed a liposuction procedure on her in December 1997. After the procedure, Knepper contacted Brown's office to report contin-uing pain and "misshapenness," and Brown performed two more liposuction procedures in an unsuccessful attempt to repair the damage. Plaintiffs eventually filed the present action against Brown and Dex, alleging claims of medical malpractice, fraud, conspiracy to commit fraud, and loss of consortium. Brown later settled with plaintiffs, leaving plaintiffs' fraud claim (and the derivative conspiracy and loss of consortium claims) against Dex to be decided at trial. Plaintiffs' fraud claim alleged that (1) Dex knew that Brown was not board certified in plastic and reconstructive surgery; (2) Dex and Brown together designed and developed an advertisement that falsely implied that Brown was a board-certified plastic surgeon; (3) Knepper wanted a board-certified plastic surgeon to perform liposuction surgery on her; (4) Knepper relied in part on the misleading Dex adver-tisement and retained Brown to perform liposuction surgery; (5) if Knepper had known the truth about Brown's creden-tials, she would not have consented to surgery by him; and (6) Brown performed the liposuction negligently, causing injury to plaintiffs.

Prior to trial, Dex moved for summary judgment, arguing, among other things, that plaintiffs could not dem-onstrate a sufficient causal link between the alleged misrep-resentation regarding Brown's credentials and Knepper's injury at the hands of Brown. The trial court granted the summary judgment motion, but the Court of Appeals reversed and remanded. *Knepper v. Brown*, 182 Or App 597, 623, 50 P3d 1209 (2002). On remand, the case proceeded to trial. At the close of evidence, Dex submitted a motion for a

directed verdict citing a lack of evidence with respect to various elements of plaintiffs' claims. The trial court denied the motion and the case went to the jury. However, the jury deadlocked and the first trial ended in a mistrial.

In a second trial, plaintiffs presented Knepper's testimony regarding her injuries and her decision to retain Brown to perform liposuction; Newman's testimony regarding Dex's involvement in developing the misleading advertisement and Dex's knowledge that the advertisement was misleading; and the testimony of Brown himself, regarding his negligent treatment of Knepper. Plaintiffs also presented the testimony of Dr. Lloyd Hale, a plastic surgeon, regarding the nature and extent of Knepper's injuries and whether Knepper's three liposuction procedures were performed in a manner that met the applicable standard of care. Hale also testified about the qualifications of dermatologists, as opposed to those of plastic surgeons, to perform surgical procedures. He observed that dermatologists usually do not receive formalized surgical training, while plastic surgeons receive extensive surgical training over a period of many years. Hale further observed that surgical knowledge, training, and experience are important for obtaining good results from liposuction. Hale acknowledged that plastic surgeons do not always meet the standard of care for liposuction or other surgical procedures, but he stated that he had never seen an injury like Knepper's—which he described as an "uncorrectable disaster"—at the hands of a doctor who had gone through formalized surgical training.

After the close of evidence, Dex again moved—on roughly the same grounds as it had in the first trial—for a directed verdict. The trial court again denied the motion. This time, however, the jury did not deadlock, but returned a $1.58 million verdict for plaintiffs, which the trial court reduced by the amount of plaintiffs' settlement with Brown. Dex thereafter moved for a judgment notwithstanding the verdict, but the trial court denied that motion.

Dex appealed, arguing that plaintiffs had failed to prove various elements of their claims and that the trial court should have granted a directed verdict, a judgment notwithstanding the verdict, or a new trial. As noted, the Court of

Appeals rejected those arguments and affirmed, *Knepper*, 213 Or App 598, and we allowed Dex's petition for review.

Before this court, Dex argues, first, that a common-law fraud claim requires evidence that the damage at issue is a reasonably foreseeable consequence of the defendant's conduct and that plaintiffs in this case failed to present such evidence. Dex acknowledges that the jury was instructed that plaintiffs must prove "that a company in Dex's position could reasonably foresee when it published the ad that Dr. Brown would be negligent in performing liposuction on [ ] Knepper and cause her injury." Dex contends, however, that, regardless of how the jury was instructed or what the jury found, plaintiffs failed to present specific evidence respecting that issue.

■ Before we turn to the merits of that issue, we briefly consider plaintiffs' objection that the issue is unpreserved—that is, that Dex never raised lack of evidence of foreseeability as a basis for its request for a directed verdict.[2] The Court of Appeals held that defendant *had* preserved the issue because, in moving for a directed verdict at the second trial, defense counsel expressly incorporated, by reference, arguments raised in the defendant's motion for a directed verdict in the first trial, including an argument that "it was not and could not have been reasonably foreseeable to Dex that publishing Brown's Yellow Pages ad would result in his committing medical malpractice against a reader of that ad." *Knepper*, 213 Or App at 603 (quoting defense motion).

Plaintiffs acknowledge that that statement was made in the first directed verdict motion, but they argue that it was presented there as a part of an entirely different argument, *viz.*, an argument that plaintiffs had failed to present evidence showing that Knepper's injuries had resulted from

---

[2] Plaintiffs acknowledge that Dex raised lack of evidence of foreseeability in its motion for judgment notwithstanding the verdict at the end of the second trial, but argues, correctly, that Dex cannot question the sufficiency of the evidence of foreseeability on appeal unless it moved to withdraw the issue from the jury *before* the jury returned its verdict. *See* ORCP 63 A ("When a motion for a directed verdict, made at the close of all the evidence, which should have been granted has been refused and a verdict is rendered against the applicant, the court may, on motion, render a judgment notwithstanding the verdict * * *."). Accordingly, the proper focus is on whether defendant raised the issue when it moved for a directed verdict.

any reliance on Brown's advertisement. Plaintiffs contend that, in light of the context in which it appeared, the sentence that the Court of Appeals quoted was not sufficient to preserve Dex's present argument.

In our view, plaintiffs are attempting to hold Dex to an unreasonably stringent standard. In tort law, the correct formulation for deciding issues of causation is not always clear, and defendant's causation argument in the cross-referenced directed verdict motion reflected a desire to cover all of the bases. While the argument may have begun with one causation theory—that plaintiffs must prove that Knepper's injuries were a "direct and necessary" result of the alleged misrepresentation—it ended with a related "backstop" causation theory—that plaintiffs must prove that Brown's malpractice (the *direct* cause of Knepper's injuries) at least was a reasonably foreseeable result of the publication of Brown's advertisement. We conclude that, although defense counsel did not specifically mention lack of evidence of foreseeability in the second trial in his oral motion for a directed verdict, his reference to the argument made in the first trial was sufficient to preserve the claim of error. We turn to the merits of that issue.

As noted, Dex's initial argument is that, to hold Dex liable for fraud, plaintiffs were required, but failed, to present evidence establishing that Brown's negligent treatment of Knepper was a reasonably foreseeable consequence of Dex's publication of Brown's advertisement. Defendant observes that this court historically has regarded "proximate cause" as an element of fraud and that several legal authorities, discussed below, generally equate the concept of proximate cause with reasonable foreseeability when applied to claims of fraud. Defendant then draws on general discussions of reasonable foreseeability in this court's *negligence* cases to support its contention that, in the *fraud* context, a defendant is liable for a plaintiff's injuries only to the extent that the *particular kind* of harm that the plaintiff suffered was a reasonably foreseeable result of the defendant's fraudulent conduct.[3] Finally, defendant relies on another of this court's

---

[3] For example, in *Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 17, 734 P2d 1326 (1987), this court stated that the issue of liability for a harm resulting

negligence cases, *Buchler v. Oregon Corrections Div.*, 316 Or 499, 853 P2d 798 (1993),[4] to support its view that a defendant may be held liable for injuries caused by a third party's "harm-producing act" only if those injuries are of a kind that are within the reasonably foreseeable scope of the risk created by the defendant's conduct. Applying that proposed rule to the present case, Dex argues that plaintiffs were required to prove that the particular type of injury that Knepper suffered—a botched medical procedure at the hands of a third party (Brown)—was a reasonably foreseeable consequence of Dex's publication of Brown's misleading advertisement. Dex further contends that plaintiffs failed to present evidence that addressed that element of the case.

We begin our analysis by noting that this is a fraud case, *i.e.*, a case involving an intentional tort. Our past cases have referred to proximate cause (or "proximate injury") as one of nine elements of a claim for tortious fraud.[5] Although our more recent cases have employed a more abbreviated list of the elements of fraud, *see, e.g., Riley Hill General Contractor v. Tandy Corp.*, 303 Or 390, 405, 737 P2d 595 (1987) (listing five elements), we agree that some notion of proximate cause is subsumed under the last element in that abbreviated list: "Damage to the plaintiff, *resulting from* [the plaintiff's] reliance [on defendant's representation]." *Id.* (emphasis added).

The question, then, is whether that notion of proximate cause or proximate injury is equivalent to the concept of

---

from a defendant's conduct "depends on whether that conduct unreasonably created a foreseeable risk * * * *of the kind of harm that befell the plaintiff.*" (Emphasis added.)

[4] In *Buchler*, this court held that the state Corrections Division was not liable in negligence for bodily injuries intentionally inflicted on members of the public by a prisoner who had escaped from the Corrections Division's supervision. The court acknowledged that the Corrections Division in some sense may have facilitated the prisoner's escape, but held that "mere 'facilitation' of an unintended adverse result, where intervening intentional criminality of another person is the harm-producing force, does not cause the harm so as to support liability for it." 316 Or at 511-12.

[5] *See, e.g., U. S. National Bank v. Fought*, 291 Or 201, 220-21, 630 P2d 337 (1981) (quoting list of nine elements of fraud, including "consequent and proximate injury," from *Conzelmann v. N.W.P & D. Prod. Co.*, 190 Or 332, 350, 225 P2d 757 (1950)); *Webb v. Clark*, 274 Or 387, 391, 546 P2d 1078 (1976) (same); *Rice v. McAlister*, 268 Or 125, 128, 519 P2d 1263 (1974) (same).

"reasonable foreseeability," as we have used that phrase in cases like *Fazzolari* and *Buchler*. We are persuaded that it is.

Courts have noted that, when an intentional tort is involved, the range of legal causation can be quite broad: " 'For an intended injury, the law is astute to discover even very remote causation.' " W. Page Keeton, *Prosser and Keeton on Torts* § 43, 293 n 6 (5th ed 1984) (quoting *Derosier v. New England Telephone & Telegraph Co.*, 81 NH 451, 130 A 145 (1925)); *see also American Fed. Teachers v. Oregon Taxpayers United*, 345 Or 1, 17, 189 P3d 9 (2008) (in action under Oregon Racketeer and Corrupt Organizations Act, person who was intended target of illegal acts was injured "by reason of" those acts). Still, the historical references to "proximate injury" as an element of fraud indicates that courts also recognize that there is *some* limitation on the consequences for which a perpetrator of an intentional fraud may be held liable. A requirement that any claimed damages be foreseeable appropriately recognizes that the scope of liability for an intentional, fraudulent misrepresentation depends on the nature of the misrepresentation, the audience to whom the misrepresentation was directed, and the nature of the action or forbearance, intended or negligent, that the misrepresentation justifiably induced. *Restatement (Second) of Torts* § 548A (1977) incorporates that requirement:

> "A fraudulent misrepresentation is a legal cause of a pecuniary loss resulting from action or inaction in reliance upon it *if, but only if, the loss might reasonably be expected to result from the reliance.*"

(Emphasis added.) Comments to that *Restatement* section make the same point even more clearly:

> "a.   * * * In general, the misrepresentation is a legal cause only of those pecuniary losses that are within the foreseeable risk of harm that it creates. There is an analogy here to the rules as to legal causation of physical harm resulting from negligent conduct, stated in §§ 435 to 461.
>
> "b.   Pecuniary losses that could not reasonably be expected to result from the misrepresentation are, in general, not legally caused by it and are beyond the scope of the maker's liability. This means that the matter misrepresented must

be considered in light of its tendency to cause those losses and the likelihood that they will follow. * * *

"In determining what is foreseeable as a result of the misrepresentation, the possibility of intervening events is not to be excluded altogether."

*Id.*, comments a, b. Similarly, in *Prosser and Keeton on Torts* § 110 at 767, the author states:

"Furthermore, the consequential or special damages must have been proximately caused by the fraudulent conduct. In general and with only a few exceptions, the courts have restricted recovery to those losses which might be expected to follow from the fraud and from events that are reasonably foreseeable."

(Footnotes omitted.)

■       When we apply that foreseeability principle in the present case, it is clear that plaintiffs' damages reasonably might be expected to result from their reliance on Dex's misrepresentation. An advertisement that misrepresents a medical provider's qualifications self-evidently creates a risk that a consumer who seeks treatment from the provider in reliance on that misrepresentation will suffer an adverse result that would not have occurred if the provider's qualifications had been as represented. The testimony at trial showed that Knepper's injuries fell precisely within the foreseeable risk of harm that the misrepresentation created: Knepper testified that she wanted to have a board-certified plastic surgeon perform the liposuction, and a juror could infer from that testimony that Knepper believed that she was more likely to suffer an adverse result from being treated by a medical provider who was not board certified in plastic surgery. Further, plaintiffs' medical expert testified that he had *never* seen adverse results like the ones that Knepper experienced from a medical provider who was certified in plastic surgery. A juror could infer from that testimony that plaintiffs' injuries probably would not have occurred if Knepper had received treatment from a board-certified plastic surgeon (as she believed Brown to be). Stated in terms of the applicable legal standard, Dex had reason to expect that Knepper would act in justifiable reliance on Dex's misrepresentation by retaining Brown for the surgery, and that an adverse result

was more likely if Brown, rather than a board-certified plastic surgeon, performed liposuction surgery. There is no additional requirement that plaintiffs also prove that Dex in fact did foresee that Knepper would suffer the *particular* adverse results of the medical services that Brown performed. It follows that plaintiffs' injuries were foreseeable as a result of Dex's intentional misrepresentation, and that is all that plaintiffs had to show. Dex must respond in damages accordingly.

We turn to Dex's next argument—that the trial court erred in declining to direct a verdict on plaintiffs' fraud and conspiracy claims on the ground that plaintiffs failed to submit any evidence that Dex had "acted maliciously, with the intention to harm another, or in reckless disregard of the consequences." Dex contends that, to prevent an unconstitutional chilling effect on the free flow of information, Oregon courts must recognize that publishers require some additional protection from claims arising out of false or misleading advertisements, and cannot be held liable for the publication of such advertisements unless the publication is done maliciously or with intent to harm another or in reckless disregard of that possibility.

We think that Dex's argument demands too much. This is not a case of the unwitting publication of an advertisement that turns out to be false. It is, instead, a case in which the publisher took a knowing and active part in the perpetration of the fraud. Punishing fraud has no impermissible "chilling" effect on the right to express views on "any subject whatever." *See* Article I, section 8, of the Oregon Constitution (protecting such a right of expression). In fact, fraud is excepted from that constitutional protection. *See State v. Robertson*, 293 Or 402, 412, 649 P2d 569 (1982) (explaining principle). What Dex argues would extend constitutional protection to fraud, and we reject that argument.

As we have explained, plaintiffs' evidence permitted the jury to infer that the fraudulent misrepresentation by Dex and Brown was designed to mislead potential patients into believing that Brown was a board-certified plastic surgeon, thereby luring them into accepting surgery by Brown

that he was not specially trained to perform. The misrepresentation created the risk that those who relied on it would be harmed as a particular result of Brown's lack of expertise as a plastic surgeon, and that is what happened to plaintiffs. The trial judge did not err in refusing to grant Dex's motions for directed verdict and judgment notwithstanding the jury's verdict.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.