Argued and submitted March 2, 2010, at Lewis & Clark Law School, Portland, Oregon, decision of Court of Appeals affirmed in part and reversed in part; judgment of circuit court affirmed May 19, petition for reconsideration and motion regarding *ex parte* contacts filed June 9 allowed by opinion July 8, 2011
See 351 Or 521, 256 P3d 100 (2011)

Mark STRAWN,
on his own behalf and as representative of
a class of similarly situated persons,
*Petitioner on Review / Respondent on Review,*

*v.*

FARMERS INSURANCE COMPANY OF OREGON,
an Oregon stock insurance company;
Mid-Century Insurance Company,
a foreign corporation;
and Truck Insurance Exchange,
a foreign corporation,
*Respondents on Review / Petitioners on Review,*

*and*

FARMERS INSURANCE GROUP INC.,
a foreign corporation,
*Defendant.*

(CC 9908-09080; CA A131605;
SC S057520 (Control), S057629)

258 P3d 1199

Kathryn H. Clarke, Portland, argued the cause for petitioner on review/respondent on review Strawn. With her on the briefs were Richard S. Yugler, David N. Goulder, and Lisa T. Hunt, Landye Bennett Blumstein LLP, Portland.

Theodore J. Boutrous, Jr., Gibson, Dunn & Crutcher LLP, Los Angeles, California, argued the cause for respondents on review/petitioners on review Farmers Insurance Company of Oregon et al. James N. Westwood, Stoel Rives LLP, Portland, filed the brief for respondents on review/petitioners on review Farmers Insurance Company of Oregon et al. With him on the brief were P.K. Runkles-Pearson, Theodore J. Boutrous, Jr., and Thomas H. Dupree, Jr., Gibson, Dunn & Crutcher LLP, Los Angeles; and David L. Yohai and Gregory Silbert, Weil Gotshal Manges LLP, New York.

Meagan A. Flynn, Portland, filed briefs in support of the petition for review on behalf of *amicus curiae* Oregon Trial Lawyers Association.

Brian S. Campf, Portland, filed a brief on behalf of *amicus curiae* Oregon Trial Lawyers Association.

Andrew M. Schlesinger, West Linn, filed a brief on behalf of *amicus curiae* United Policyholders.

Thomas M. Christ, Cosgrave Vergeer Kester LLP, Portland, filed a brief on behalf of *amicus curiae* Oregon Association of Defense Counsel.

Brian T. Hodges, Bellevue, Washington, filed a brief on behalf of *amicus curiae* Pacific Legal Foundation. With him on the brief were Deborah J. La Fetra and Timothy Sandefur, Sacramento, California.

Before De Muniz, Chief Justice, and Durham, Kistler, Balmer, Walters, and Linder, Justices.**

---

** Gillette, J., retired December 31, 2010, and did not participate in the decision of this case. Landau, J., did not participate in the consideration or decision of this case.

LINDER, J.

Balmer, J., dissented and filed an opinion.

## LINDER, J.

Plaintiff Mark Strawn filed a class action against defendants Farmers Insurance Company of Oregon, Mid-Century Insurance Company, and Truck Insurance Exchange (collectively, Farmers).[1] The complaint alleged that Farmers had breached its contractual obligations and committed fraud by instituting a claims handling process that arbitrarily reduced payments for reasonable medical benefits owed under its automobile insurance policies. A jury returned a verdict for plaintiffs. Based on that verdict and a post-verdict class claims administration process, the trial court entered a judgment against Farmers for approximately $900,000 in compensatory damages and $8 million in punitive damages. Farmers appealed. On appeal, the Court of Appeals concluded that the punitive damages award exceeded federal constitutional limits, but otherwise affirmed the judgment. *Strawn v. Farmers Ins. Co.*, 228 Or App 454, 209 P3d 357 (2009).

Both parties petitioned for review. In its petition, Farmers presented three issues. The first two raise challenges to the liability verdict entered against Farmers. The third issue challenges the punitive damages award, arguing that the Court of Appeals should have reduced the punitive damages award further. In plaintiffs' petition, they first contend that the Court of Appeals should not have reached the constitutionality of the punitive damages award for procedural reasons. Alternatively, plaintiffs contend that the full amount of punitive damages awarded by the jury was within constitutional limits.

We allowed both petitions for review. As we will explain, we reject Farmers's arguments that seek to set aside the jury's liability determinations on plaintiffs' claims. On the punitive damages issues, we conclude that the Court of

---

[1] The trial court and the Court of Appeals were not always consistent in how they referred to the parties in this case. The courts sometimes referred to "plaintiff" in the singular, and other times to "plaintiffs" collectively to indicate both Strawn and the other class members. Similarly, the courts below sometimes referred to defendants collectively as "Farmers" in the singular, and other times as "defendants" in the plural. For purposes of this opinion, we use "plaintiff Strawn" to indicate Strawn alone, "plaintiffs" to indicate Strawn and the class members, and "Farmers" in the singular to refer to all defendants.

Appeals should not have reached Farmers's constitutional challenge to the amount of the punitive damages award. Consequently, we affirm in part and reverse in part the decision of the Court of Appeals, and we affirm the judgment of the trial court.

## I. FACTS AND PROCEDURAL BACKGROUND

This case involves personal injury protection (PIP) benefits offered by insurance policies written by Farmers. Both by statute and by contract, Farmers was obligated to pay "[a]ll reasonable and necessary expenses of medical, hospital, dental, surgical, ambulance and prosthetic services incurred within one year after the date of the person's injury," up to a certain limit. ORS 742.524(1)(a).[2] Because the parties do not take issue with the summary of the facts provided by the Court of Appeals (which were set out in the light most favorable to plaintiffs, as the prevailing party), we quote that summary here:

> "Before 1998, Farmers processed requests for PIP benefits by having its claims adjusters review each medical bill to determine whether the bill was reasonable—that is, whether it was both 'usual and customary.' In 1997, however, Farmers decided to change that process. In an effort to recover losses and regenerate its surplus after the 1994 Northridge, California earthquake, Farmers instituted its 'Bring Back a Billion' campaign. Farmers' corporate headquarters in Los Angeles alerted its regional offices of the 'increasing importance' of generating money without raising premiums. In June 1997, Farmers instructed its

---

[2] During the class period, ORS 742.524(1)(a) (1997) provided, in part:

"(1) Personal injury protection benefits as required by ORS 742.520 shall consist of the following payments for the injury or death of each person:

"(a) All reasonable and necessary expenses of medical, hospital, dental, surgical, ambulance and prosthetic services incurred within one year after the date of the person's injury, but not more than $10,000 in the aggregate for all such expenses of the person. Expenses of medical, hospital, dental, surgical, ambulance and prosthetic services shall be presumed to be reasonable and necessary unless the provider is given notice of denial of the charges not more than 60 calendar days after the insurer receives from the provider notice of the claim for the services."

The statute has since been amended to increase the policy limit to $15,000, a change that is inconsequential to this case. Or Laws 2003, ch 813, § 2. Other than that change, the quoted portions of the statute remain the same. All references to the statute in this opinion are to the 1997 version.

Portland office to reduce payment of PIP benefits to realize 'PIP dollar savings * * *[,] an untouched area.'

"In an effort to reduce PIP payments, the Oregon PIP claims manager, Heatherington, contracted with Medical Management Online (MMO), a bill review vendor. MMO, in turn, licensed a 'cost containment software program' from Medata, a company that manages a database of roughly 100 million medical expenses. The software sorts those medical expenses by Current Procedural Terminology (CPT) codes, geographic region, and price. CPT codes, which are created by the American Medical Association, are used by medical providers to bill insurers. Geographic regions in the database are defined according to 'PSRO' areas, which are socio-demographic regions established by the federal government in 1980 for workers' compensation purposes. For Oregon, the federal government identified two PSRO areas: (1) the Portland-metro area and (2) the rest of the state.

"The software allowed MMO's clients (mostly insurance companies and state agencies) to determine whether a bill from a medical provider was more expensive than a given percentage of the range of charges in other bills for the same CPT code in the provider's designated geographic area. Clients were able to select any percentile that they wished, and MMO then evaluated the bills that it received from the client to determine whether the bills exceeded that percentile. If a bill exceeded the preselected percentile, MMO generated an Explanation of Benefits (EOB) form that reduced payment with reference to 'reason code' 'RC40.' The EOB explained the code as follows:

" 'RC40: This procedure was reduced because the charges exceeded an amount that would appear reasonable when the charges are compared to the charges of other providers within the same geographic area.'[3]

"The software was promoted as reducing medical provider payments by 26 percent.

"Beginning in January 1998, Farmers implemented its new PIP handling process through MMO—a process that, in Heatherington's words, represented 'a significant change

---

[3] Other EOB forms used the reason code "B2." For purposes of our review, that code is essentially equivalent to an "RC40" reason code.

in the way we handle our bills.' Farmers selected the eight-ieth percentile as the cutoff point for 'reasonable' expenses. That is, Farmers determined that any bills that exceeded the eightieth percentile in the MMO database would be deemed to exceed the 'reasonable' charge and would be 'reduced' to that eightieth percentile. The program worked as follows: After Farmers' insureds were treated for their injuries, their medical providers sent their bills directly to Farmers. Farmers then forwarded the bills to MMO, and MMO entered the bills into its database. If the bill was more than the charge that was at the eightieth percentile of the charges for that same CPT code in the designated region, MMO documented that fact on an EOB form with an RC40 code.

"Although Farmers contended at trial (and still con-tends) that the EOB form constituted only a 'recommenda-tion' from MMO as to reasonableness, claims adjusters were expected to follow the recommendation. The adjusters were downgraded if they departed from MMO's recommen-dations and were rewarded when they followed them. Thus, the 'recommendation' was, as a practical matter, the final determination of reasonableness.

"Between January 26, 1998 and July 21, 1999 (the class period), Farmers reduced more than 60,000 individual bills by a total of approximately $750,000. The majority of the individual reductions were small: 90 percent were for $25 or less; more than one quarter were for $3 or less. Although Farmers offered medical providers an opportunity to justify the charges that exceeded the established percentile, it was generally not cost-effective for medical providers to pursue those avenues. The medical providers who took advantage of the opportunity to justify their charges rarely secured any additional payment from Farmers. When the providers were unable to secure full payment from Farmers, the insureds became responsible for the unpaid amounts.

"As previously noted, Farmers selected the eightieth percentile as the cutoff point for payment of 'reasonable' charges. That cutoff point, though profitable for Farmers, also yielded an increase in customer complaints. The com-plaints were particularly problematic for Heatherington and Reinhardt, a regional claims manager, because cus-tomer service satisfaction was one of the components for measuring their performance and compensation. Together, Heatherington and Reinhardt decided that the percentile

should be raised to see whether customer relations would improve, and, on May 21, 1999, Farmers raised the cutoff point to the ninetieth percentile. Three weeks before this class action case was filed, Farmers increased the cap to the ninety-ninth percentile. Reinhart reported to corporate headquarters that this was the right tack to take 'while the litigation is pending.' "

*Strawn*, 228 Or App at 458-61 (footnotes omitted).

Plaintiff Strawn filed a class action against Farmers in August 1999. The trial court certified the class action in June 2000. Pursuant to the certification order, the class was declared to consist of "all persons who were entitled to PIP benefits from Farmers under Farmers's standard terms for PIP coverage, whose benefit payments were reduced by Farmers on the basis of codes RC40 or B2 during the period January 26, 1998 to July 21, 1999, and whose claims are not barred." Plaintiffs, alleging a total of approximately 8,000 class members, asserted four claims for relief against Farmers: (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) declaratory judgment, and (4) fraud.[4] Plaintiffs sought punitive as well as compensatory damages.

In a stipulated statement of the case that the trial court read to the jury at the outset of the trial, the parties summarized the underlying nature of the action:

"Plaintiffs contend that Farmers failed to comply with the PIP law and Farmers' policy contract provisions by failing to pay all reasonable medical expenses it was required to pay. * * * Plaintiffs contend that this practice of Farmers of applying these percentile reductions, and without conducting an adequate review or appeal process of these reductions, was arbitrary and unreasonable and resulted in Farmers failing to pay all reasonable medical expenses. Plaintiffs['] First Claim contends this practice of Farmers breached its insurance policy contract to its policyholders. Plaintiffs' Second Claim contends that this practice of Farmers breached its implied duty of good faith and fair dealing with respect to performance of its insurance policy

---

[4] The parties generally refer to plaintiffs' claim as one for "fraud," but sometimes refer to that same claim as one for "deceit." For the sake of consistency, we refer to it throughout this opinion as plaintiffs' claim for fraud.

contract. Plaintiffs['] [Fourth] Claim contends that Farmers engaged in fraud toward the class members with respect to this practice and related non-disclosures to class members."

The jury returned a verdict for plaintiffs on their claims for breach of contract, breach of the implied duty of good faith and fair dealing, and fraud,[5] awarding them $757,051.33 in compensatory damages and $742,948.67 in prejudgment interest.[6] The jury also awarded $8 million in punitive damages on plaintiffs' claim for fraud.

Ultimately, as noted, the trial court entered judgment against Farmers for approximately $900,000 in compensatory damages and $8 million in punitive damages. Farmers appealed to the Court of Appeals, raising multiple issues bearing on liability as well as challenging the amount of the jury's punitive damages award. The Court of Appeals rejected all but one of Farmers's claims of error, agreeing only that the punitive damages award exceeded constitutional limits. 228 Or App at 457. The Court of Appeals granted relief accordingly. *Id.* at 488. As already noted, both plaintiffs and Farmers sought review of the Court of Appeals decision, and this court allowed both petitions.

## II.   ISSUES ON REVIEW

On review, the issues before us divide into two categories. The first are challenges that Farmers raises in connection with the merits of plaintiffs' various claims of

---

[5] Plaintiffs also prevailed on their claim for declaratory judgment, which was tried to the court.

[6] The trial was essentially bifurcated, however, as to the award of compensatory damages. The first step in assessing damages was to obtain the jury's verdict, which effectively set the maximum amount that could be awarded to the plaintiffs. Specifically, the jury was directed to calculate compensatory damages (if any) as the difference between the face amount of all class medical bills and the reduced amounts actually paid by Farmers on those bills (plus prejudgment interest).

The second step in assessing damages was a claims adjustment process to refine downward any compensatory damages awarded by the jury. Because of the class action posture of the case, before the trial court could enter final judgment, it first had to offer class members the opportunity to file individual claims for damages. ORCP 32 F(2) (2002) (requiring class members entitled to individual recoveries to be given opportunity to submit a statement requesting affirmative relief). For any class member who failed to file a claim, Farmers would not be required to pay, and the class member would not be entitled to recover, individual damages. ORCP 32 F(2), (3) (2002).

liability. The second are challenges that both parties raise to the Court of Appeals' determination of the amount of punitive damages that constitutionally could be awarded against Farmers. We begin with the issues bearing on liability, which would include plaintiffs' fraud claim on which the jury awarded punitive damages. If we were to reverse the verdict on the fraud claim, that disposition would obviate the need to reach the punitive damages issues that the parties present.

A.  *Whether Farmers was precluded from rebutting the reasonableness of plaintiffs' medical expenses with individualized evidence*

On review to this court, the first issue that Farmers raises is whether it was permitted to present a full defense to plaintiffs' claims. Specifically, Farmers asserts that the trial court did not permit Farmers to present evidence to the jury that would have rebutted the reasonableness of the medical charges submitted by individual class members for PIP reimbursement and, conversely, that would have established the reasonableness of Farmers's investigation of those individual PIP claims.

Before turning more directly to that issue, it is helpful to describe, as context for our discussion, the relevant core theories on which the parties proceeded at trial. A key component of all of plaintiffs' claims—including the fraud claim—was the allegation that Farmers, by using their percentile-reduction claims handling process, had failed to pay the class members' "reasonable" medical charges. At trial, the parties took different positions on plaintiffs' burden to establish the "reasonableness" of the class members' medical charges. Farmers's position was that plaintiffs were required to present individualized proof as to the reasonableness of each class member's medical charges. Plaintiffs' position was that, under the statutory scheme governing PIP benefits, the amounts charged by medical providers, as presented by their bills, were presumed "reasonable." Thus, according to plaintiffs, once class members produced their medical bills, the burden shifted to Farmers to disprove the reasonableness of the billed medical charges.

The trial court resolved that central dispute through summary judgment proceedings, concluding that plaintiffs

were legally entitled to a presumption of reasonableness, based on the amounts that their medical providers charged. Consequently, in the trial court's view, once plaintiffs produced evidence of the medical bills for the individual class members, the burden shifted to Farmers to rebut the presumption that the amounts charged were reasonable.

After the trial court's summary judgment ruling, Farmers continued to preserve its position on that question, as reflected in certain procedural motions that Farmers raised. For example, at the end of plaintiffs' case-in-chief, Farmers renewed its position by moving to decertify the class on that theory, among others, that plaintiffs' claims (including the fraud claim) were not conducive to class treatment, because plaintiffs were required to present individualized proof of the reasonableness of their medical charges. Likewise, Farmers moved for a directed verdict at that point, urging, *inter alia*, that plaintiffs had the burden to prove the reasonableness of the individual medical charges submitted for PIP reimbursement and that they had failed to sustain that burden. At each juncture, the trial court adhered to its ruling that plaintiffs' evidence of their medical bills presumptively established the reasonableness of the charges, and that the burden then shifted to Farmers to rebut reasonableness.

On appeal to the Court of Appeals, Farmers assigned error to the trial court's rulings on that issue, arguing, among other points, that the reasonableness of the class members' medical expenses required individualized proof and should not be presumed based on their medical bills. Plaintiffs argued the converse. By the time the Court of Appeals issued its decision, this court had decided *Ivanov v. Farmers Ins. Co.*, 344 Or 421, 185 P3d 417 (2008). Relying on *Ivanov*, the Court of Appeals rejected Farmers's position:

> "In our view, *Ivanov* defeats Farmers' contention that plaintiffs failed to offer sufficient proof of the reasonableness of their medical expenses. In this case, as in *Ivanov*, the 'gravamen of plaintiffs' complaint was that Farmers' review methodology was an impermissible one.' *Id*. at 430. Thus, plaintiffs were not required to offer any additional evidence that, at the time the bills were submitted, they were reasonable; the expenses were presumptively reasonable at that point. Instead, Farmers had the burden of

establishing that 'the procedures it employed to deny plaintiffs' claims satisfied its statutory and common-law duties.' *Id.*"

*Strawn*, 228 Or App at 465.

On review to this court, Farmers no longer maintains that plaintiffs had the burden to present individualized proof of the reasonableness of their medical expenses. Rather, given the holding in *Ivanov*, Farmers now accepts that the amounts of plaintiffs' medical bills presumptively established the reasonableness of their medical charges. Farmers further accepts that, once that presumption was in place, the burden shifted to Farmers to rebut that presumption by showing that its investigation and processing of the claims resulted in payment of plaintiffs' reasonable and necessary medical expenses, thus satisfying Farmers's legal obligation.

What Farmers does dispute, however, is whether the trial court permitted Farmers to make that rebuttal showing. According to Farmers, the trial court cut off Farmers's ability to do so by excluding evidence relevant to whether Farmers reasonably investigated the individual claims and whether Farmers reimbursed plaintiffs in an amount that represented their reasonable medical expenses. Farmers urges that, by excluding such evidence, the trial court effectively made the presumption of the reasonableness of plaintiffs' medical charges "irrebuttable," which "was not the plan envisioned by *Ivanov*." Farmers also argues that the excluded evidence had relevance beyond the narrow question of whether Farmers reimbursed the individual plaintiff class members for their reasonable medical charges. Withholding that evidence from the jury, Farmers urges, also skewed the case in favor of a classwide finding of liability and a damages award by not permitting the jury to consider evidence relevant to the reprehensibility of Farmers's conduct.

An essential problem with Farmers's arguments, however, is that they are not arguments that Farmers made to the trial court or to the Court of Appeals. To be sure, Farmers points to some items of evidence that the trial court ruled inadmissible before and during trial. But having reviewed the rulings that Farmers challenges, we agree with

plaintiffs that the trial court did not foreclose Farmers from offering any evidence for the purpose that Farmers now asserts the evidence would have been relevant—*viz.*, to establish the reasonableness of Farmers's investigation of the individual claims or to show that the payments that Farmers made to the individual class members met Farmers's obligation to pay their reasonable medical expenses. In other words, Farmers did not present to the trial court the theories of admissibility that it advances now.

Some specific rulings are illustrative.[7] Before trial, plaintiffs filed a motion *in limine* to exclude evidence that medical providers had written off the balances of the bills that Farmers had not paid under its percentile reduction procedure. Plaintiffs also filed a motion *in limine* to exclude evidence that some class members either had a right to be paid, or actually had been paid, by third-party tortfeasors for the amounts that Farmers had refused to pay under the percentile reduction program. Plaintiffs argued (among other things) that those categories of evidence either were not relevant, or that, if relevant, were inadmissible under OEC 403 because the evidence would unduly prejudice or confuse the jury.

In response, Farmers argued a more narrow theory of relevancy than it now advances. With regard to provider write-offs, Farmers urged that the evidence showed that class members often did not become liable for the unpaid portions of the bills, which Farmers asserted was relevant both to damages and punitive damages. Similarly, Farmers urged that evidence of third-party tort liability was relevant to damages.[8] The trial court granted the motions *in limine*, concluding that the challenged evidence was inadmissible under

---

[7] Farmers's arguments weave together several different and sometimes unrelated evidentiary rulings by the trial court, not all of which may have been the subject of a proper assignment of error in the Court of Appeals. We need not decide whether all of the evidentiary issues that Farmers raises were adequately preserved at trial and presented to the Court of Appeals. We are satisfied that, even if they were, the theory of admissibility that Farmers advances to this court is not one Farmers preserved below.

[8] At times, Farmers's arguments appear to potentially implicate that more narrow basis for the trial court's ruling. Farmers's petition for review did not present any challenge to the trial court's ruling on that ground, however. In the absence of a more focused and developed argument by Farmers as to why the Court of

OEC 403 (although the trial court later permitted evidence of third-party liability during the post-verdict claims administration phase of the case). Farmers did not argue to the trial court—as it now does to this court—that evidence of write-offs and third-party liability should be admitted to rebut the presumption that the class member plaintiffs' medical charges were reasonable. Rather, throughout trial, after losing the issue on summary judgment, Farmers held to its theory that plaintiffs had the burden to produce individual evidence of the reasonableness of their medical expenses and that Farmers had no burden in that regard.

Farmers also asserts to this court that the trial court denied it the ability to present "individualized evidence" through what Farmers characterizes as a "blanket exclusion" that effectively required Farmers to present only collective evidence as to how Farmers treated PIP benefit claims. The ruling that Farmers cites, however, was again more narrow. Before plaintiff Strawn brought this class action against Farmers, Farmers had reduced reimbursement for one of Strawn's medical bills, because that bill exceeded Farmers's percentile cutoff. At trial, Farmers sought to introduce evidence that the bill was for medical services that had been unnecessary, which, Farmers believed, would support a conclusion that Farmers lawfully could have refused to pay the bill in its entirety. *See* ORS 742.524(1)(a) (PIP benefits cover medical expenses that are both "reasonable *and* necessary" (emphasis added)). The trial court sustained plaintiffs' objection to that evidence, reasoning that Farmers, having reduced reimbursement for the charge based only on its percentile cutoff, could not, at that point, shift its reasoning and claim that the entire charge was medically unnecessary. That ruling does not support Farmers's claim that the trial court made a broad or "blanket" ruling excluding evidence of how Farmers had reviewed and handled individual claims; the court merely refused to allow Farmers to present a new and after-the-fact reason for denying a particular bill. Nothing in that ruling prohibited Farmers from introducing individualized evidence about how it handled PIP benefit claims,

Appeals' resolution of the issue merits this court's review and was wrong, we decline to disturb that resolution.

and Farmers did not argue to the trial court that the evidence was relevant on that theory.

As a final example, Farmers asserts that "the jury never learned that Farmers actually overrode RC40/B2 recommended reductions, paying submitted medical charges in full, in numerous individual cases." Farmers's argument in that regard, however, is telling. Farmers acknowledges that "[t]he focus of the trial here was not on the *investigation* but on the reasonableness of the underlying *charges*." (Emphasis in original.) In other words, the fight at trial was over whether plaintiffs' medical bills established a rebuttable presumption of reasonableness, not over whether Farmers had rebutted that presumption by showing the reasonableness of its investigation. That was the focus because, as Farmers concedes, the law on the point had not yet been settled by *Ivanov*. Despite conceding that the trial was so focused, Farmers urges that, "had individualized evidence been admitted, Farmers could have shown—and did show during the claims administration process—that it had a reasonable investigation process." In particular, Farmers urges that it "could have shown, for example," that it overrode the recommended percentile reductions in many cases or had other reasons why reimbursement was reduced.

What Farmers now recognizes it could have shown with certain evidence is beside the point, however. The issue is whether the trial court prevented Farmers from placing evidence before the jury that was relevant to the reasonableness of its claims handling process and its PIP payments to plaintiffs. Farmers points to no place in the record where Farmers offered, and the trial court excluded, evidence that Farmers overrode the recommended reductions in individual cases. Farmers may appreciate now what it could have argued based on evidence that it either did not seek to place before the jury, or that it placed before the jury for other reasons.[9] But that hindsight appreciation establishes no error on

---

[9] Farmers stated in its Court of Appeals' brief that, "in most instances, Farmers followed the [recommended percentile reductions]." It also acknowledged that it "presented its own uncontested evidence that (1) its adjustors had the authority to override the recommended reductions, and (2) they sometimes did so." Farmers relied on that evidence in connection with a different point—*i.e.*, that

the trial court's part or a fundamental denial of Farmers's right to defend against plaintiffs' fraud claim.[10]

### B. *Whether plaintiffs failed to present evidence of classwide reliance*

The second question that Farmers presents on review is whether it was entitled to a directed verdict on plaintiffs' fraud claim. Farmers argues that plaintiffs failed to present proof of reliance, as they were obligated to do, sufficient to support a conclusion that all members of the class detrimentally relied on Farmers's misrepresentation that they would pay reasonable medical expenses.

To provide context for our discussion of Farmers's arguments, we begin by describing plaintiffs' fraud claim and the proof on which plaintiffs relied.[11] The essential elements

---

plaintiffs had failed to carry their burden of proof to demonstrate the reasonableness of the medical charges that the class members submitted to Farmers, and that the trial court had improperly shifted the burden of proof on reasonableness to Farmers. Thus, Farmers's argument in that regard suggests that its pre-*Ivanov* theory of the relevancy of that evidence differed from its post-*Ivanov* understanding of how it *could* have used some of its own evidence to better advantage at trial.

[10] Farmers also argues that the trial court erroneously excluded evidence of a 2003 legislative amendment (Oregon Laws 2003, chapter 813, section 4) to the PIP statutes. According to Farmers, that legislation would have been relevant to show that Farmers's percentile reduction process for reimbursement was reasonable. In response to a pretrial motion to exclude that evidence, the trial court concluded that it was inadmissible under OEC 403. Farmers did not assign error to that ruling in the Court of Appeals. *See Strawn*, 228 Or App at 474-75 (declining to consider certain arguments advanced by Farmers because of Farmers's failure to comply with ORAP 5.45 pertaining to the form and necessity of particularized assignments of error). The Court of Appeals considered the effect of that legislation only in connection with Farmers's contention that the trial court's declaratory ruling was rendered moot by the 2003 legislative change. *Id.* at 475-76. For those reasons, Farmers's challenge to the trial court's evidentiary ruling is not properly before us. *See* ORAP 9.20(2) (questions on review ordinarily limited to those questions "properly before the Court of Appeals").

[11] In its merits brief, Farmers begins its argument on this score by first urguing that plaintiffs never pleaded "a viable fraud claim in this case." Farmers points out that the purported misrepresentation that Farmers made was the provision in its PIP insurance policies stating that Farmers would pay reasonable and necessary medical expenses of its insured. According to Farmers, "a failure to fulfill such obligation, even if intentional, sounds only in contract, not tort." Farmers does not dispute that fraud will lie for inducing a contract through a promise of future performance if the promise is made with the intent not to perform (so-called "fraud in the inducement"). *See, e.g., Jones v. Northside Ford Truck Sales*, 276 Or 685, 556 P2d 117 (1976) (for fraud based on nonperformance of contractual obligation, intent not to perform future promise must exist when promise is made). But

of a common-law fraud claim are: the defendant made a material misrepresentation that was false; the defendant did so knowing that the representation was false; the defendant intended the plaintiff to rely on the misrepresentation; the plaintiff justifiably relied on the misrepresentation; and the plaintiff was damaged as a result of that reliance. *See Handy v. Beck*, 282 Or 653, 659, 581 P2d 68 (1978) (outlining elements); *see generally Knepper v. Brown*, 345 Or 320, 329, 329 n 5, 195 P3d 383 (2008) (noting older cases listing nine elements of common-law fraud, and more recent cases using a more abbreviated list of elements). In this case, in allegations common to all of plaintiffs' claims, plaintiffs set out the standard PIP terms of Farmers's no-fault automobile policy—*i.e.*, that Farmers would cover medical expenses for bodily injury to an insured arising out of the operation or use of an automobile, and defining medical expenses to mean "all reasonable and necessary expenses" of medical, hospital, and related health providers as required by Oregon law. Plaintiffs also alleged that Farmers was required by Oregon law to provide PIP benefits no less favorable than required by ORS 742.524(1), which the complaint quoted. Then, for the fraud claim specifically, plaintiffs alleged that Farmers intentionally represented to plaintiffs that it would pay all reasonable medical and hospital expenses incurred by policyholders due to an automobile accident; that plaintiffs relied on that representation and incurred medical and hospital charges at usual and customary rates; that Farmers's representation was knowingly false, in that Farmers did not disclose to plaintiffs its cost containment procedures for determining benefits and by misrepresenting, when it paid reduced benefits, how those benefits were calculated; that plaintiffs did not know that Farmers's representations were false; and that, as a direct result of Farmers's misrepresentations and omissions, plaintiffs incurred medical and hospital costs for which they were not reimbursed by Farmers.

---

Farmers contends that plaintiffs did not plead that theory or adequately prove that Farmers had its cost containment procedures in place (and thus, intended not to perform its future promise) when plaintiffs obtained or renewed their insurance policies. We agree with the Court of Appeals that Farmers did not preserve a challenge to plaintiffs' pleadings on that theory. *Strawn*, 228 Or App at 468. Neither did Farmers challenge plaintiffs' evidence as insufficient to support the fraud claim on that basis. Thus, Farmers's arguments in that regard are not properly before us.

Farmers's motion for directed verdict raised several challenges to the adequacy of plaintiffs' evidence on their various claims. As to plaintiffs' fraud claim, Farmers's argument was not extensive, but it did directly take issue with whether plaintiffs had adequately proved reliance on the part of the class as a whole. Specifically, Farmers argued:

> "Plaintiffs' deceit[, *i.e.*, fraud] claims require proof that plaintiffs relied on a material misrepresentation or omission of defendants. Several class members testified about their expectations and understanding of the insurance policy and information received from Farmers about the claims process. However, there is no evidence common to the class which establishes that the absent class members relied upon any material misrepresentation or omission of the defendants."

The trial court denied the motion, concluding that, viewed in the light most favorable to plaintiffs,[12] the evidence created a jury question on classwide reliance. On appeal, the Court of Appeals agreed, explaining that evidence of reliance by the absent class members need not be direct, but could be inferred:

> "[P]laintiffs offered evidence that, viewed in the light most favorable to plaintiffs, established that Farmers (1) promised to pay all reasonable and necessary medical expenses as part of its PIP coverage; (2) selected an arbitrary percentile cutoff that would increase its profits at the expense of insureds; and (3) continued to collect premiums from its insureds without informing them that it had decided not to pay all reasonable and necessary expenses. From that evidence, a reasonable trier of fact could conclude that the payment of reasonable and necessary PIP-related expenses was a material part (and, in fact, a statutorily required part) of the insurance policy and could therefore reasonably infer that plaintiffs relied on Farmers' misrepresentation that it would pay reasonable and necessary PIP-related expenses when they continued to pay their premiums. That is, on this record, a reasonable trier of fact could conclude

---

[12] *See Bolt v. Influence, Inc.*, 333 Or 572, 578, 43 P3d 425 (2002) (in deciding motion for directed verdict, a trial court must consider all the evidence, including reasonable inferences, in the light most favorable to the party opposing the motion).

that plaintiffs acted to their detriment in paying premiums for PIP coverage that Farmers never intended to provide."

*Strawn*, 228 Or App at 470-71(citations omitted).

On review, Farmers characterizes the Court of Appeals as having indulged a "presumption" of reliance, one that relieved plaintiffs of their burden to prove reliance on the part of each of the class members. Farmers argues that, as a matter of law, reliance in a fraud case "can never be presumed" and the obligation to prove reliance therefore poses a particular evidentiary challenge to a class action plaintiff. At a minimum, according to Farmers, a class action plaintiff must present "competent evidence from which a jury can conclude that class members were generally aware of a claimed misrepresentation and acted on the basis of that awareness." Farmers thus asserts that, in the context of this case, plaintiffs had to come forward with proof that each class member knew of the representation at issue, interpreted it to mean that Farmers would pay full billed charges, and relied on that representation. Here, Farmers maintains, plaintiffs presented absolutely "no evidence," either individualized by class member or common to the class, from which the jury could logically draw the necessary conclusion of reliance as to all class members.

Plaintiffs, for their part, agree that they had to prove reliance for the class as a whole, rather than reliance only by plaintiff Strawn or isolated members of the class. But classwide reliance, they urge, does not require *direct* evidence of reliance by every individual class member. Instead, plaintiffs urge, such reliance can be inferred in a proper case, and this is such a case. Here, the evidence showed that the class members received insurance policies in Farmers's standard form, containing the same promise to pay PIP benefits in the form of reimbursement for "reasonable medical expenses," as defined by the policy and by statute. All class members, after being involved in an accident, made a claim for the contractually promised PIP benefits. All sought and received medical services, and all (subject to some variation shown during the individualized damages phase of the trial) received reduced payments based on Farmers's percentile reduction

methodology. Plaintiffs argue that the evidence of the promise made and the actions that class members took is sufficiently common to the class to permit a jury to infer classwide reliance on Farmers's representation that it would pay their reasonable medical expenses.

In making their respective arguments, the parties debate at some length the significance of our decision in *Newman v. Tualatin Development Co. Inc.*, 287 Or 47, 54, 597 P2d 800 (1979). We agree that *Newman* provides guidance for this case. We therefore turn to the issue presented in that case and what this court held in resolving it.

The plaintiffs in *Newman* were purchasers of townhouses built and sold by the defendant. They brought a class action on behalf of all such purchasers, seeking damages based on the defendant's use of galvanized, instead of copper, water pipes in the townhouses. The trial court had certified the class for purposes of the plaintiffs' negligence and implied warranty claims, but declined to certify it for the express warranty claim. Based on the particular evidence presented at the class certification stage of the proceeding, this court agreed that individual determinations of reliance would be necessary, with the result that "common questions of fact would not predominate over questions affecting individual members of the class." *Id.* The court explained:

"Plaintiffs contend individual determinations will not be required because direct evidence of reliance is not necessary. All that is required is proof that the seller's statements were of a kind which naturally would induce the buyer to purchase the goods and that he did purchase the goods.

"Plaintiffs contend that the warranty was made in a sales brochure given to all purchasers. Even if plaintiffs can prove the brochure was given to all members of the class in this case, that would not establish that every member of the class read, was aware of, and relied upon each of the representations in the brochure. The brochure made statements about many features of the townhouses,—various floor plans, vaulted ceilings, color-matched kitchen appliances, brick-enclosed courtyards, etc. The water pipes and their composition is a relatively minor component."

*Id.* (internal quotes and citations omitted).

Citing *Newman,* Farmers asserts that reliance, whenever it is an element of a class action claim, must be established through direct evidence of each class member's individual reliance. But *Newman,* as the portion of the decision just quoted reveals, does not stand for that proposition. *Newman* expressly tied its holding to the weaknesses of the particular evidence submitted in support of class certification on the express warranty claim. Immediately after discussing those weaknesses, *Newman* expressly disavowed that individual evidence of reliance was required as a matter of law in all class actions:

> "We do not hold that an express warranty is never an appropriate subject for a class action adjudication or that the issue of reliance always requires individual determination. However, here, the alleged express warranty is such a small part of the item purchased and the representation is interspersed with many other descriptive statements."

*Id.* at 54. *Newman* thus turned on its particular facts, while leaving other class actions requiring proof of reliance to do the same. And although *Newman* did not declare when reliance can be determined through common, rather than individualized evidence, it at least suggested an answer—*viz.,* when the same misrepresentation was made to all individual class members and was sufficiently material or central to the plaintiff's and the defendant's dealings that the individual class members naturally would have relied on the misrepresentation.[13]

---

[13] *Newman* arose in a different procedural posture—a dispute over class certification. The question of whether reliance must be shown by individualized evidence, or whether it can be inferred from evidence common to the class, is one that often arises in connection with the predicate determination of whether the case is appropriate for class treatment. *See generally* Mary J. Cavins, Annotation, *Consumer Class Actions Based on Fraud or Misrepresentation,* 53 ALR3d 534, 536-57 (1977) (collecting case law arising out of consumer class actions for fraud and misrepresentation). When individualized evidence is required, the individual issues are more likely to predominate in a way that precludes class treatment. *Id.* at 536.

Class certification does not foreclose issues over the adequacy of a class plaintiff's proof of reliance, however. Here, in certifying the class, the trial court did *not* list reliance as one of the issues of law and fact common to the class. On the other hand, the trial court did not treat the list of common issues as exclusive either, and did not declare in advance that reliance would be determined through individual

Such a standard for inferring classwide reliance from evidence common to the class accords with what we consider to be the better-considered authority in other jurisdictions. As many courts have concluded, whether classwide reliance can be inferred from evidence common to the class depends on the misrepresentation. A key consideration is whether the misrepresentation was uniformly made to all class members, as through standardized documents, or whether the evidence shows material variations in how the misrepresentation may have been communicated, as with oral representations made by different agents.[14] A second key consideration is the nature of the misrepresentation itself: how likely it is that class members would have uniformly relied on it and, conversely, the likelihood that their reliance would vary significantly from one class member to the next.[15]

One particularly instructive case, with factual parallels to this one, is *Klay v. Humana, Inc.*, 382 F3d 1241 (11th Cir 2004), *cert den*, 541 US 1081 (2005). *Klay* was a class action case brought by a large number of physicians against

---

class member evidence. The issue was thus left to be determined based on plaintiffs' evidentiary showing at trial, which Farmers properly drew into question through its directed verdict motion. Although the parties spar to some extent over the significance of class certification in this case, whatever challenges Farmers may have raised to class certification have dropped from the case; none has been raised to this court on review. The only question is the adequacy of plaintiffs' proof, a question that certification, in and of itself, does not resolve.

[14] *Compare, e.g., Rohlfing v. Manor Care, Inc.*, 172 FRD 330, 338-39 (ND Ill 1997) (common evidence permitted inference of classwide reliance where all class members signed standardized contract and received specific written representations about pharmaceutical pricing) *with Stout v. J.D. Byrider*, 228 F3d 709, 718 (6th Cir 2000) (district court did not abuse discretion in determining that individualized reliance evidence was required, given variations in what documents customers reviewed, what representations agents made to customers, and whether customers selected extended service agreement).

[15] *See, e.g., Peterson v. H & R Block Tax Services, Inc.*, 174 FRD 78, 84-85 (ND Ill 1997) (all class members paid significant fee for tax refund loan that they did not qualify to receive; only logical explanation for doing so was reliance on misrepresentation as to availability of loan); *Smith v. MCI Telecommunications Corp.*, 124 FRD 665, 678-79 (D Kan 1989) (implausible that, in accepting and continuing employment, sales employees would not have relied on written commission plans that they were required to sign). *See generally* FRCP 23(b)(3) Advisory Committee Note (1966) ("[A] fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action[.] * * * On the other hand, although having some common core, a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed.").

almost all major health maintenance organizations (HMOs) alleging, among other claims, fraud. The alleged misrepresentations that formed the basis for the fraud were that the HMOs agreed to reimburse physicians for all medically necessary services. The physicians alleged that the HMOs artificially and covertly underpaid them by using automated statistical and other criteria, rather than medical necessity, to calculate reimbursement amounts. *Id.* at 1247. In affirming the class certification on the fraud claim, the Eleventh Circuit agreed that the plaintiffs, to prove their case, had to establish reliance on the part of each class member. But the court concluded that, "based on the nature of the misrepresentations at issue, the circumstantial evidence that can be used to show reliance is common to the whole class." *Id.* at 1259. The court reasoned:

> "The alleged misrepresentations in the instant case are simply that the defendants repeatedly claimed that they would reimburse the plaintiffs for medically necessary services they provide to the defendants' insureds[.] * * * It does not strain credulity to conclude that each plaintiff, in entering into contracts with the defendants, relied upon the defendants' representations and assumed they would be paid the amounts they were due. A jury could quite reasonably infer that guarantees concerning physician pay—the very consideration upon which those agreements are based—go to the heart of these agreements, and that doctors based their assent upon them. * * * Consequently, while each plaintiff must prove reliance, he or she may do so through common evidence (that is, through legitimate inferences based on the nature of the alleged misrepresentations at issue)."

*Id.*

The rule adopted by the authorities that we have cited, and implicitly suggested in this court's decision in *Newman,* is sound. To prevail in a class action for fraud, the class plaintiff must prove reliance on the part of all class members. Direct evidence of reliance by each of the individual class members is not always necessary, however. Rather, reliance can, in an appropriate case, be inferred from circumstantial evidence. For that inference to arise in this context,

the same misrepresentation must have been without material variation to the members of the class. In addition, the misrepresentation must be of a nature that the class members logically would have had a common understanding of the misrepresentation, and naturally would have relied on it to the same degree and in the same way.

Not all fraud claims will lend themselves to common evidence of reliance, rather than individualized proof. *Newman* is a good example of a case that did not. As the decision in *Newman* emphasized, the representation at issue there was one of myriad statements made in a sales brochure for the townhouses, a brochure that the evidence did not establish had been given to every putative class member. Equally important, whether individual purchasers cared about the kind of water pipes in the townhouses—which the court characterized as a "relatively minor component" (*Newman*, 287 Or at 54)—as opposed to other features, could readily vary from one purchaser to the next and, on the evidence before the court, simply was not established.

This case presents a more compelling basis for the inference of classwide reliance. The misrepresentation at issue here was in a uniform provision of a contract for motor vehicle insurance, not a sales brochure that may not even have ended up in the hands of all of the class members.[16] The fact that the promise was in a written and binding contract of insurance, rather than in a sales brochure, provides a stronger basis than in *Newman* to infer classwide reliance. Even so, contracts are often complex documents, ones that can incorporate a wide array of terms, many of which contain provisions that would not—at least for purposes of a fraud claim—be uniformly understood or relied on by any person who might enter into the contract.

---

[16] As plaintiffs pleaded in their complaint, the class certification was premised, in part, on the fact that plaintiff Strawn's claims were typical of those of the class because "[t]he class members and plaintiff [Strawn] were all persons having automobile policies with [Farmers] containing the same PIP language and subject to the same PIP statute[.]" Farmers does not dispute that the evidence established that the class members' contracts of insurance contained standardized PIP provisions that were, in all material ways, uniform for the class as a whole.

A motor vehicle liability policy, however, is distinctive, both in many of its terms and in the reasons for its purchase. As plaintiffs pleaded, and as was emphasized to the jury throughout the trial, PIP benefits are a statutorily mandated provision of motor vehicle insurance in Oregon. ORS 742.520(1) (mandating PIP coverage for "[e]very motor vehicle liability policy issued for delivery in this state" for private passenger motor vehicles). The terms of required PIP coverage are extensively controlled by statute as well. *See* ORS 742.524 (describing mandatory benefits); ORS 742.530 (describing permissive exclusions from benefits). An insurer may provide greater PIP coverage than the statutes require, but not less. *Utah Home Fire Ins. Co. v. Colonial Ins.*, 300 Or 564, 568, 715 P2d 1112 (1986) (insurance policy cannot provide fewer PIP benefits than the law requires it to provide); ORS 742.532 (policy may provide more favorable personal injury protection benefits than required by law). Thus, although the policy is required to state the coverage that the policy provides (ORS 742.450(1)), the policy provides PIP benefits, regardless of whether it so declares.

Persons insuring and driving motor vehicles licensed in Oregon have corresponding obligations. To register or renew a motor vehicle license in Oregon, the applicant must provide assurance of compliance with the financial responsibility laws.[17] ORS 803.370 (registration of motor vehicle); ORS 803.460 (registration renewal). Most people meet that obligation—as the class members in this case did— by purchasing a motor vehicle liability policy that satisfies the requirements of Oregon law. *See* ORS 806.060(2)(a) (specifying when policy of insurance will satisfy financial responsibility requirements); *see generally* OAR 735-050-0050 (1997) (identifying information to be presented as part of certificate of insurance). Finally, it is unlawful for a person to drive a vehicle in Oregon without meeting the financial responsibility requirements of Oregon law; doing so is a

---

[17] The financial responsibility laws basically require those who may be liable for damages arising out of the use of a motor vehicle to be able to pay damages up to certain specified amounts, either through insurance or by establishing their ability to pay through certain other means. *See* ORS 806.060 (specifying methods of compliance for financial responsibility requirements).

Class B traffic offense. ORS 806.010 (defining offense of driving uninsured).

Against that extensive regulatory backdrop, a person who purchases a motor vehicle policy to meet the financial responsibility requirements of Oregon law does not need to read the policy to justifiably rely on its provisions. That person has no choice to buy a policy without PIP coverage. The insurer issuing the policy has no choice to issue it without PIP coverage. The entire scheme is structured to permit the purchasers of such insurance, as well as the state in its regulatory role, to have confidence that the policy provides all coverage, including PIP benefits, that is required to meet the financial responsibility laws. Given the statutory requirements for the contents of motor vehicle policies, and the responsibilities imposed on persons who are obligated to purchase such policies, an insured's reliance on the PIP coverage that the policy provides is inherent in the purchase of the insurance, or at least, a factfinder is entitled to infer as much.[18]

---

[18] The dissent characterizes our holding as raising a presumption of reliance. *E.g.*, 350 Or at 375 (Balmer, J., dissenting). We disagree. Our conclusion is only that, in this distinctive context, actual reliance can be inferred from the nature of the transaction involved. That context consists of a regulatory scheme that involves mutually reinforcing obligations for purchasers of motor vehicle liability policies and the insurers who issue those policies in Oregon. One of those obligations is that the purchaser must obtain, and the insurer must provide, the statutorily required minimum PIP coverage. Reliance is potentially "self-proving" from the nature of the transaction itself, in which case the transaction is circumstantial evidence of actual, not presumed, reliance. *See, e.g., Chisolm v. TranSouth Financial Corp.*, 194 FRD 538, 560-61, 560 n 24 (ED Va 2000) (noting that reliance can be "self-proving" in certain kinds of transactions, and that what is involved is not so much "presumed reliance" as it is a showing of demonstrated reliance via circumstantial proof).

That permissible inference of reliance is not altered by the fact these policies, as motor vehicle liability policies commonly do, contained several types of coverage in addition to the PIP coverage at issue. *See* 350 Or at 375-76 (Balmer, J., dissenting) (noting that policies at issue also provided liability coverage, uninsured and underinsured motorist coverage, collision coverage, and comprehensive coverage). Some of the other coverage is likewise mandatory. *See* ORS 742.502 (required uninsured and underinsured motorist coverage); ORS 742.504 (similar). Whether one coverage provision is mandatory for purchasers to obtain and insurers to provide, or three such provisions are, does not change the analysis. Our reliance analysis in this case would not extend, however, to coverage (such as collision) that is not statutorily required.

For those reasons, a jury could infer from evidence common to the class that the individual class members relied on Farmers's misrepresentation that it would pay its insureds' reasonable medical expenses arising out of their automobile accidents; individualized evidence of the class members' reliance was not necessary to create a jury question on that element of plaintiffs' fraud claim. Consequently, the trial court properly denied Farmers's motion for directed verdict on that ground.

C. *Whether the Court of Appeals correctly resolved Farmers's challenge to the constitutionality of the punitive damages award*

The final issue before us is one that both parties raise on review: whether the Court of Appeals correctly determined that the amount of punitive damages awarded by the jury in this case was constitutionally excessive. Relying on its understanding of the applicable federal due process standards, the Court of Appeals concluded that the jury's award of $8 million in punitive damages was excessive, and that the highest amount that the jury could constitutionally award was four times the combined amount of plaintiff's compensatory damages and prejudgment interest. *Strawn*, 228 Or App at 485. The court therefore vacated the judgment with instructions to grant Farmers a new trial on the issue of punitive damages, unless plaintiffs on remand were to agree to a remitittur of the punitive damages award. *Id.*

On review to this court, both parties assert that the Court of Appeals' 4:1 ratio is legally in error. Farmers contends that the ratio should be lower; plaintiffs contend that the ratio should be higher. Preliminarily, however, plaintiffs also contend that Farmers's challenge to the punitive damages award was not properly before the Court of Appeals and, therefore, the Court of Appeals should not have reached it at all. We turn to plaintiffs' argument in that regard because, as we will explain, it is dispositive.

As context for our discussion, we begin by describing the parties' post-verdict positions on whether the trial court should have reduced the jury's punitive damages award, as advanced in the procedural motions and memoranda that the

parties filed. After the jury returned its verdict, the parties filed a series of motions through which plaintiffs effectively asked the trial court to validate the amount of the jury's punitive damages award, while Farmers effectively asked the court to reduce that award. Plaintiffs filed the first of those motions, requesting that the trial court "affirm" the jury's punitive damages award under *former* ORS 18.537(2) (2001), *renumbered as* ORS 31.730 (2003) (requiring trial court to assess whether a punitive damages award is "within the range of damages that a rational juror would be entitled to award"). Farmers opposed that motion and also filed a motion for remittitur, urging in support of both motions that the punitive damages award exceeded federal due process standards as described in *State Farm Mut. Automobile Ins. Co. v. Campbell,* 538 US 408, 123 S Ct 1513, 155 L Ed 2d 585 (2003), and *BMW of North America, Inc. v. Gore,* 517 US 559, 116 S Ct 1589, 134 L Ed 2d 809 (1996).[19] Plaintiffs opposed Farmers's motion for remittitur, asserting, among other reasons, that the motion was "procedurally defective" because Farmers had not conjoined it with a motion for new trial. The parties' positions and objections were renewed and revised through a series of further motions. For our purposes here, it is not important to describe that entire series. It suffices to observe that they culminated in: (1) Farmers's alternative motions for remittitur and new trial, seeking to reduce the punitive damages award; and (2) plaintiffs' opposition to those motions.

What is important for our purposes is that Farmers's motions and plaintiffs' opposition to them framed two broad issues on which the parties disagreed. The parties not only disagreed on the merits of Farmers's motion (*viz.,* whether the jury's punitive damages award comported with constitutional standards), they also disagreed about what procedures a defendant must follow to preserve a constitutional objection to the excessiveness of a jury's punitive damages award.

---

[19] Farmers's motion for remittitur also took issue with other aspects of the jury's award, such as the amount of prejudgment interest that the jury awarded, but the issues before us do not implicate those disputes between Farmers and plaintiffs.

In arguing that Farmers had failed to present its constitutional objections in a procedurally proper way, plaintiffs advanced several theories. One was waiver. In particular, plaintiffs asserted that Farmers should have taken any or all of a series of procedural steps during trial to ensure that the jury returned a punitive damages award consistent with due process standards. One such step, plaintiffs urged, was that Farmers should have sought to have the jury instructed that any punitive damages award it might make could not exceed whatever upper limit Farmers believed was constitutionally imposed. Plaintiffs also argued that, after the jury returned its verdict, Farmers should have objected to the discharge of the jury and requested that the jury be reinstructed to "deliberate further" to make sure that the punitive damages award did not exceed constitutional limits, citing *Building Structures, Inc. v. Young*, 328 Or 100, 968 P2d 1287 (1998) (party who fails to object to defective jury verdict before jury is discharged waives objection to the defect). In addition to those waiver arguments, plaintiffs urged that Farmers's motions suffered from other procedural defects as well. They included Farmers's failure, through a motion for directed verdict or some other procedural means, to move to strike plaintiffs' prayer for punitive damages on the ground that it exceeded whatever amount that Farmers believed was the constitutional maximum; Farmers's failure to move against plaintiffs' complaint or challenge the sufficiency of plaintiffs' evidence on that same theory; and Farmers's failure to condition its motions on a waiver of its right to appeal as to all other alleged errors during the trial (which plaintiffs urged was required at common law).

Farmers responded to plaintiffs' waiver and other procedural objections by arguing that a defendant cannot challenge a verdict for punitive damages as excessive until after the jury renders its verdict. Farmers urged that alternative motions for remittitur or new trial were the appropriate procedural means for raising its federal due process objection to the punitive damages award, citing *Parrott v. Carr Chevrolet, Inc.*, 331 Or 537, 558-59 n 14, 17 P3d 473 (2001) (party cannot challenge verdict for punitive damages as constitutionally excessive until after jury renders verdict; motion for new trial is among appropriate procedures for

raising such challenge). In oral argument on the motions, plaintiffs responded to Farmers's reliance on *Parrott* by asserting the statements in that case were *dicta* and by contending that there were many "big questions raised" by Farmers's procedural choices.

Ultimately, the trial court agreed with plaintiffs, both with their procedural position and with their position on the merits. In its oral ruling, the trial court found "at the outset" that "there's been waiver" by Farmers and that, in the court's view, "a finding of waiver is actually dispositive." The trial court also considered the merits of Farmers's challenge, stating expressly that it was doing so in the alternative, because of the possibility that an appellate court would not agree with the court's waiver determination. On the merits, the trial court concluded that the jury's punitive damages award was not constitutionally excessive. The written findings of fact and conclusions of law that the trial court later issued were consistent with its oral declaration, although more detailed. In them, the trial court concluded that Farmers had waived its constitutional objections, that its motions were procedurally defective in other regards, and that, on the merits, Farmers's challenge that the punitive damages award was excessive failed.

On appeal to the Court of Appeals, Farmers's opening brief assigned error to the award of punitive damages, but did not specify the rulings being challenged.[20] The sole argument that Farmers made in support of its claim of error was that the trial court had erred in resolving the merits of the motion against Farmers. That is, Farmers argued at length that the jury's punitive damages award exceeded federal due process standards, and that the trial court had erred in concluding otherwise. Farmers made no mention of the trial court's procedural ruling that Farmers had waived its

---

[20] The actual assignment of error was less than precise as to the rulings that Farmers sought to challenge. Under the caption "Assignment of Error No. 7" the assigned error was only that "Punitive Damages Are Not Allowable. Alternatively, a Remittitur is Required." *See* ORAP 5.45(3) ("Each assignment of error shall indentify precisely the legal, procedural, factual, or other ruling that is being challenged.").

challenge or had otherwise not followed the proper procedural route to raise and preserve it. Instead, Farmers contended that the motion had been deemed denied on the expiration of the 55-day period prescribed by ORCP 64 F (which we will discuss shortly).

In response to Farmers's argument, plaintiffs first urged that the Court of Appeals could not reach the issue of whether the award was excessive, because Farmers had not challenged the waiver and other procedural grounds on which the trial court ruling also rested. Plaintiffs then argued, in the alternative, that the trial court's resolution of Farmers's excessiveness challenge to the punitive damages award was correct. In its decision, the Court of Appeals resolved the Farmers's excessiveness challenge without acknowledging or addressing the waiver and procedural grounds on which the trial court had alternatively based its ruling. *Strawn*, 228 Or App at 476-85.

On review, plaintiffs challenge the Court of Appeals' failure to affirm the trial court on the alternative procedural grounds that Farmers did not challenge. Farmers, for its part, does not question the proposition that, when a court's decision or ruling is premised on alternative grounds, a party challenging that ruling generally must take issue with all independent and alternative grounds on which it is based to obtain relief. *Cf. State ex rel Juv. Dept. v. Charles*, 299 Or 341, 343, 701 P2d 1052 (1985) (dismissing petition as improvidently granted, because Court of Appeals decision rested on an independent ground and state petitioned for review on one ground only; thus, this court would be required to affirm the Court of Appeals on the issue for which review was not sought). Neither does Farmers disagree that the trial court in fact did conclude that Farmers had waived and procedurally defaulted in bringing its challenge to the punitive damages award, as alternative grounds for resolving that award. And finally, Farmers does not dispute that, to preserve an issue on appeal, a party must make the issue the object of a proper assignment of error and supporting argument in the party's opening brief. *See* ORAP 5.45(1) ("No matter claimed as error will be considered on appeal unless the claim of error * * * is assigned as error *in the opening brief* * * *." (Emphasis added.)).

Farmers's principal response is that the trial court had lost its jurisdiction to articulate any reasons for denying the motion. Farmers contends that its motion for new trial was denied by operation of law before the trial court ruled on it, so the court's order was void. Under ORCP 64 F,[21] if a trial court has not "heard and determined" a motion for new trial within 55 days after entry of judgment, that motion is deemed denied by operation of law, and the trial court lacks jurisdiction to enter any order on the motion. *McCollum v. Kmart Corporation*, 347 Or 707, 711, 226 P3d 703 (2010). In this case, the trial court held the hearing on Farmers's motions on the last day of the 55-day period, orally ruled on the motion at that time, and signed a simple order denying the motions in open court before the hearing ended. The trial court did not, however, sign and enter its lengthier written findings and conclusions in support of its order until after that period had expired. Based on that, Farmers argues that the trial court's oral waiver ruling was ineffective, since it was not memorialized in writing until after Farmers's motions were denied by operation of law, at which point the trial court had no further jurisdiction over the motions.

That analysis, however, overlooks the legal effect of the trial court's ruling at the time of the hearing. During the hearing, the trial court stated that it was denying Farmers's motions and briefly explained its reasons on the record, including its waiver determination. The court then signed— in open court—an order denying Farmers's motions, and expressly declared that it was doing so: "At this time I'm signing the order denying Farmers's motions which I've already identified. So that order is signed." Under ORS 3.070, the order became immediately effective, and thus took effect before Farmers's motion for new trial would have been deemed denied by operation of law.[22] For that reason, Farmers's jurisdictional argument is unavailing.

---

[21] ORCP 64 F(I) provides, in part:

"The motion [for new trial] shall be heard and determined by the court within 55 days from the time of the entry of the judgment, and not thereafter, and if not so heard and determined within said time, the motion shall conclusively be deemed denied."

[22] ORS 3.070 provides, in part:

"Any judge of a circuit court in any judicial district may, in chambers, grant and sign defaults, judgments, interlocutory orders and provisional

Farmers makes a second, alternative argument, as well. It contends that the trial court should be deemed to have denied the motion for new trial without any explanation of its reasoning. Farmers contends that the trial court's oral statements of its reasoning were ineffective, because they were not memorialized in writing. Farmers further reasons that the written findings of fact and conclusions of law were ineffective, because they were filed and entered after the trial court had denied the motion for new trial. Based on those alleged defects of form and timing, Farmers effectively urges that a reviewing court is required to ignore the trial court's stated reasons for its decision.

We find no merit to that contention. By its terms, ORCP 64 F requires a motion for new trial to be heard and determined within 55 days from entry of judgment, but it requires no written statement of reasons or other explanation in support of the ruling. Neither does it preclude a trial court from memorializing its reasoning after ruling on the motion in open court within the time allowed. Such written explanations and findings are generally very helpful to the appellate courts in meaningfully reviewing a trial court's ruling, and we are not inclined to foreclose their consideration unnecessarily. In this instance, the only mandate contained in ORCP 64 F is that the motion for new trial be resolved within the prescribed period. Here, it was. The trial court

remedies, make findings and decide motions, demurrers and other like matters relating to any judicial business coming before the judge from any judicial district in which the judge has presided in such matters. * * * The judge may exercise these powers as fully and effectively as though the motions, demurrers, matters or issues were granted, ordered, decided, heard and determined in open court in the county where they may be pending. If signed other than in open court, all such orders, findings and judgments issued, granted or rendered, other than orders not required to be filed and entered with the clerk before becoming effective, shall be transmitted by the judge to the clerk of the court within the county where the matters are pending. They shall be filed and entered upon receipt thereof and shall become effective from the date of entry in the register."

Although ORS 3.070 does not explicitly address the effective date of orders made in open court, it does do so implicitly. Our cases involving orders signed outside of open court likewise have implicitly recognized that same proposition in the course of analyzing when those orders took effect. *See, e.g.,* *McCollum,* 347 Or at 712 (since 1991, an order not signed in open court becomes effective only upon entry in the register); *Ryerse v. Haddock,* 337 Or 273, 281, 95 P3d 1120 (2004) (order denying motion for new trial did not become effective until entered in the register, because it was signed "other than in open court").

ruled in open court; it briefly stated its reasoning orally; the written order denying the motion for new trial was signed in open court and specifically stated that future findings would be issued; and the findings themselves were signed, filed, and entered within two weeks, and before the filing of any notice of appeal. Farmers advances no persuasive reason why the trial court's written explanation of its timely determination of the motion should not be given full consideration by the appellate courts.[23]

We therefore conclude that the Court of Appeals erred in reaching Farmers's challenge to the punitive damages award as excessive. The trial court articulated two alternative reasons for denying Farmers's motions (waiver and other procedural defects, as well as a conclusion on the merits that the award did not exceed constitutional limits). The trial court further expressly concluded that both bases on which it ruled were independently sufficient to support the trial court's ruling. Logically, that was true. On appeal, Farmers

---

[23] Farmers makes two other abbreviated arguments that we also reject. First, Farmers asserts that it did challenge the "waiver" ruling in the Court of Appeals. Nothing in Farmers's opening brief even acknowledged the existence of the trial court's alternative reasons, however, much less notified the Court of Appeals that Farmers challenged those reasons.

In its reply brief, Farmers did summarily contend that the trial court's waiver and procedural rulings were erroneous after plaintiffs, in their responding argument, argued that the Court of Appeals could not reach the issue because Farmers did not challenge the procedural grounds on which the trial court had ruled. But advancing such a new and different argument for the first time in a reply brief is not the proper way to preserve an argument in the Court of Appeals. *See* ORAP 5.45(6) (supporting argument must follow assignment of error in opening brief); *see generally Ailes v. Portland Meadows, Inc.*, 312 Or 376, 379-80, 826 P2d 956 (1991) (Court of Appeals should not have reached alternative waiver argument when that argument, in addition to not having been preserved in trial court, was not raised in opening brief on appeal and was instead presented for the first time in reply brief). *Compare, e.g., Stanich v. Precision Body and Paint, Inc.*, 151 Or App 446, 456, 950 P2d 328 (1997) (new claim in reply would not be considered) *with Estate of Michelle Schwarz v. Philip Morris Inc.*, 348 Or 442, 456-57, 235 P3d 668 (2010) (challenge to giving uniform instruction adequately preserved where opening brief, although it did not discretely assign error to such, raised an issue that presented the same legal question, identified the error in preservation section, and argued the point sufficiently to prompt responsive argument by opposing party).

Second, Farmers asserts that the Court of Appeals necessarily considered and rejected the waiver and other procedural defects found by the trial court. We fail to see how that is so. Farmers had specifically argued to the Court of Appeals that the motion for new trial had been denied by operation of law, and so the trial court's reasoning was a nullity. The Court of Appeals may have simply accepted that argument.

failed to preserve any challenge to the waiver and other procedural grounds on which the trial court's order was alternatively based. Any error by the trial court concerning the constitutionality of the punitive damages award therefore was necessarily harmless. The Court of Appeals should have affirmed the trial court's order denying the motion for new trial. *See generally Jensen v. Medley*, 336 Or 222, 239-40, 82 P3d 149 (2003) (affirming judgment, despite erroneous jury instruction on one of plaintiff's theories of liability, where defendant did not challenge another basis for liability).

In so concluding, we emphasize that we do not decide whether the trial court's alternative grounds for its ruling were sound. The correctness of the trial court's waiver and other procedural analyses are not before us, just as those issues were not before the Court of Appeals. Indeed, it is precisely because the trial court's alternative grounds for ruling were not challenged by Farmers that the issue of the excessiveness of the punitive damages award was not before the Court of Appeals for its determination. Likewise, whether that award was constitutionally excessive is not before us. For that reason, the punitive damages award must be affirmed.

## III.  CONCLUSION

We reject Farmers's arguments on review that the trial court either committed evidentiary error or erred in denying Farmers's motion for directed verdict. We agree with plaintiffs that the Court of Appeals should not have reached the merits of Farmers's assertion that the punitive damages award exceeded constitutional limits. The decision of the Court of Appeals is reversed in that respect only.

The decision of the Court of Appeals is affirmed in part and reversed in part. The judgment of the circuit court is affirmed.

**BALMER, J.,** dissenting.

The majority labors long and faithfully to bring this tortured case, filed in the last century, to a conclusion, and I

agree with important aspects of the majority's opinion.[1] However, because I believe the majority's discussion of the reliance element of plaintiffs' fraud claim is flawed, I must respectfully dissent.

This was never a simple case, but it evolved into an unfortunately—and unnecessarily—complex proceeding. That complexity was, in part, the result of choices made by both parties (at trial and on appeal) and by the trial court, but it also arose from the statutory context of the claims (including the insurance code and the financial responsibility law), the overlay of class allegations, the shifting legal landscape created by appellate decisions issued during the decade that the case was pending (such as *Ivanov v. Farmers Ins. Co.*, 207 Or App 305, 140 P3d 1189 (2006), *rev'd*, 344 Or 421, 185 P3d 417 (2008)), and the ever-changing procedural and substantive rules involving punitive damages. At the end of the day, that complexity created a variety of traps for the unwary, which, in large part, form the basis for the Court of Appeals' rejection of many of Farmers's arguments and this court's rejection of Farmers's argument regarding the amount of punitive damages.

Some of those traps (to continue the metaphor) may have been set by Farmers itself, either inadvertently or for reasons of trial strategy, and I agree with the majority that established rules of preservation prevent Farmers from raising a variety of otherwise potentially meritorious arguments on appeal. However, for the reasons set out below, I disagree with the majority's conclusion that evidence in the record supported the jury's finding that plaintiffs and the class

---

[1] In particular, I agree with the majority that Farmers failed to preserve objections to certain of the trial court's evidentiary rulings, although the issue is a close one. *See* 350 Or at 346-51. I also agree with the majority's rejection of Farmers's argument that reliance, when it is an element of a class action claim, always must be established through direct evidence of each class member's individual reliance. *See id.* at 356. Rather, as the majority concludes, in an appropriate class action case, classwide reliance may be inferred from evidence common to the class; whether that evidence is sufficient in a particular case will depend on the nature of the misrepresentation, among other factors, and I disagree with the majority on whether the evidence was sufficient here. Finally, I agree with the majority's interpretation of ORCP 64 F and the majority's conclusion that the trial court order giving its reasons for denying defendant's motion for a new trial was valid, even though that order was not issued within 55 days after entry of judgment. *See id.* at 367-69.

members that they represented relied on Farmers's alleged misrepresentations.

The gravamen of plaintiffs' case was that Farmers had instituted a procedure for reviewing charges by medical providers that provided care to Farmers's insureds under the "personal injury protection" (PIP) coverage of their automobile insurance policies. Under the procedure, charges at or less than the eightieth percentile of charges for comparable procedures in the same geographic area would be considered by Farmers to be "reasonable" and paid.[2] Charges in excess of the eightieth percentile were considered excessive and were paid only in exceptional circumstances. Plaintiffs alleged that Farmers's procedure violated ORS 742.524(1)(a), which requires an insurer to pay all "reasonable and necessary" medical expenses for covered claims and that Farmers's conduct in implementing the procedure also constituted breach of contract and fraud. Plaintiffs' central argument on their fraud claim was that Farmers had falsely represented that they would pay "reasonable" medical expenses when they did not, in fact, intend to pay *all* reasonable charges. The jury found in favor of plaintiffs on the fraud claim; on the basis of that finding, the jury also was allowed to consider punitive damages, and it awarded substantial punitive damages to plaintiffs.

The majority rejects Farmers's argument that the trial court erred in denying its motion for a directed verdict on the fraud claim, holding that plaintiffs introduced sufficient evidence for the jury to find that the class representatives and the class as a whole *relied* on misrepresentations that Farmers made to them. To put it bluntly, even if Farmers's insurance policies (or the insurance code) could be construed to constitute a *representation to policyholders* that Farmers would pay *all* "reasonable" charges, which representation was *false* because Farmers in fact intended to base its "reasonableness" determination on (and only to pay) all charges at or below the eightieth percentile, there is scant evidence that any plaintiff *relied*, to his or her detriment, on that representation. And there is virtually no evidence from

---

[2] Farmers later changed the eightieth percentile level to the ninetieth and then the ninety-ninth.

which a jury could infer that the class of Farmers policy-holders who made PIP claims relied on that representation.

I first discuss the majority's reliance holding and then consider other ways in which reliance might be proved here. "Reliance," of course, is an element of fraud, and must be proved. *See Gardner v. Meiling*, 280 Or 665, 671, 572 P2d 1012 (1977) ("Implicit in the element of reliance is a require-ment [that] the plaintiff prove a causal relationship between the representation and his entry into the bargain."). The majority appears to accept plaintiffs' argument that reliance need not be proved by "direct" evidence and that it can, instead, be "inferred," 350 Or at 354, and in an appropriate case that might be true. But the majority goes on to hold that, because the class members were required by law to have insurance, bought policies from Farmers, "received" those policies (which included a statement that Farmers would pay "reasonable" PIP charges), and then made PIP claims, a jury could find that they "relied" on Farmers's misrepresenta-tions. *Id.* at 360-62. The majority, without citation to any case or statute, then reaches the quite far-reaching conclusion that "an insured's *reliance* on the PIP coverage that the policy provides is *inherent* in the purchase of the insurance." *Id.* at 361 (emphasis added). Based on that understanding, it is but a small step for the majority to conclude that "a jury could infer from evidence common to the class that the individual class members relied on Farmers's misrepresentation that it would pay its insureds' reasonable medical expenses." *Id.* at 362.

What is missing from the majority opinion, however, is a discussion of *how* the class representatives *relied* on Farmers's misrepresentations: what the plaintiffs did, or did not do, *because of* Farmers's misrepresentations. Ordinarily, in fraud cases, the plaintiff must prove that the misrepresen-tation "induced [the plaintiff] to make the agreement," *Gardner*, 280 Or at 671. Even in the rare case where this court has allowed a fraud claim to proceed in the absence of a direct misrepresentation conveyed to the plaintiff, we always have insisted that the plaintiff allege and prove reliance. *See Handy v. Beck*, 282 Or 653, 656, 581 P2d 68 (1978) (permit-ting fraud claim based on false drilling report filed with state

engineer; plaintiffs "testified that they would not have purchased the property had they known the well did not meet state standards").

The majority's position, in contrast, seems to be that it doesn't really matter whether any of the named plaintiffs (or the class members) either received or relied upon any representations about Farmers's PIP coverage, either before or after they bought the policies, or before or after they submitted PIP claims.[3] That gap is bridged by the majority's assertion, quoted above, that reliance is "inherent in the purchase of the insurance." Although the majority suggests at one point that it was important that the representations were "uniform" and that all class members received "written and binding contract[s] of insurance," 350 Or at 359, the logic of the majority's position has nothing to do with those facts. Indeed, the majority's reasoning detaches "reliance" from any affirmative representation of any kind to a policyholder and from any action or omission by that policyholder, and makes it depend instead on the statutory requirements of the financial responsibility law and the insurance code. That analysis would seem to support including within the class any person who had a Farmers policy, whether or not they ever received a copy of it or had any idea of its terms.

Indeed, although the class here included only persons who had PIP charges that exceeded Farmers's payment level, one can easily imagine a fraud claim on behalf of a class of all Farmers policyholders who assert that they *overpaid* for their policies because they were paying for (and thought that they had) policies that complied with ORS 742.524(1)(a), when in fact those policies did not comply. It is difficult to see why "misrepresentation," "reliance," and "loss" all could not be inferred on a classwide basis for such a class, given the majority's conclusion that "reliance * * * is inherent in the purchase of the insurance." 350 Or at 361.

One case that the majority does cite is *Klay v. Humana*, 382 F3d 1241 (11th Cir 2004), *cert den*, 541 US 1081 (2005), which the majority states is instructive because

---

[3] The majority states that a policyholder "does not need to read the policy to justifiably rely on its provisions." 350 Or at 361. It follows logically that it does not matter whether the policyholder ever received a copy of the policy.

it involved fraud claims by physicians against a group of HMOs alleging that the HMOs had agreed to reimburse the physicians for all medically necessary services when, in fact, the HMOs covertly underpaid the physicians by using undisclosed statistical criteria to calculate reimbursement amounts. *Klay* bears some similarities to this case, but does not support the majority on the issue where the majority and I part ways. *Klay* was only a case about class certification itself—it concluded that a class of physicians making the allegations described above could be certified. *Klay* says nothing about what *evidence* of reliance would be sufficient for a jury to render a fraud verdict in favor of plaintiffs.

*Klay* also reiterates the well-established rule that "each plaintiff must prove reliance" to make out a fraud claim, and also makes the point, with which I agree, that " 'he or she may do so through common evidence (that is, through legitimate inferences based on the nature of the alleged misrepresentations * * *).' " 350 Or at 358, *quoting Klay*, 382 F3d at 1259. But *Klay* also emphasizes—in a way that directly undercuts the majority's holding here—that *"reliance may not be presumed* in fraud-based RICO actions; instead the evidence must demonstrate that each individual plaintiff actually relied upon the misrepresentations at issue." *Klay*, 382 F3d at 1257-58 (emphasis added). And the case that *Klay* relies upon for that proposition, *Sikes v. Teleline, Inc.*, 281 F3d 1350, 1362 (11th Cir 2002), makes the point even more forcefully: A plaintiff must demonstrate that he or she *"relied* on a misrepresentation made in furtherance of [a] fraudulent scheme" because *"[i]t would be unjust to employ a presumption* to relieve a party of its burden of production when that party has all the evidence regarding that element of the claim." (Emphasis added.) By holding that reliance, in this case, is inherent in the purchase of the insurance and thus that the jury could infer classwide reliance based on the existence of the insurance contracts, the majority creates the very presumption that *Klay* and *Sikes* caution against.

*Klay* contrasts with this case in another way that demonstrates why the majority errs in allowing reliance to be presumed in this case because it is inherent in the purchase of insurance. There, the representation by the HMOs that

they would reimburse the physicians for all medically necessary services went to the entire purpose of the agreement between the physicians and the HMOs. If reliance can be presumed from the nature of the representation, *Klay* might be a case where that would be permitted—although, as noted, the court in *Klay* explicitly held that reliance could *not* be presumed. Here, in contrast, Farmers's misrepresentation was about a small part of the PIP coverage, which was itself a small part of the policy as a whole, because the policy also provided liability coverage, uninsured motorist coverage, underinsured motorist coverage, collision coverage, and comprehensive coverage. The particular method of PIP reimbursement was not significant enough to allow the jury to conclude that reliance was "inherent" when a policyholder purchased a Farmers policy or made a PIP claim.[4]

In terms of the significance of the misrepresentation to any action that a plaintiff might take in reliance upon it, this case is far more like *Newman v. Tualatin Development Co. Inc.*, 287 Or 47, 597 P2d 800 (1979), than *Klay*. In *Newman* this court rejected an effort by plaintiffs in a class action to prove reliance based on an express representation to class members. We did so, not because reliance always must be proved by individual evidence from each class member— as the majority notes, we expressly rejected that argument— but because, in that case, "the alleged express warranty is such a small part of the item purchased and the representation is interspersed with many other descriptive statements." 287 Or at 54. "[R]*eliance* upon the express warranty," we concluded, "is not proved merely by evidence that the warranty was contained in a sales brochure given to all class members." *Id.* (emphasis added). For the same reasons, it is not appropriate in this case to permit the jury to infer that each class member, simply by buying a policy from Farmers, *relied* on Farmers's misrepresentations regarding "reasonable" medical expenses for PIP claims.

There are, of course, cases where courts allow reliance to be proved without actual evidence that the plaintiff

---

[4] Even PIP medical expenses that exceeded the eightieth percentile—those that Farmers declined to pay—did so by only a modest amount. Ninety percent were for $25 or less; more than 25 percent were for $3 or less.

acted or failed to act based on the defendant's misrepresentation. Some securities fraud cases, such as *Affiliated Ute Citizens of Utah v. United States*, 406 US 128, 152-53, 92 S Ct 1456, 31 L Ed 2d 741 (1972), have permitted a presumption of reliance when the defendant had a specific duty to disclose information that it failed to disclose—a circumstance not present here. Other cases have presumed reliance under a "fraud on the market" theory, where the defendant's misrepresentations affected the market price of the stock, even though the purchaser did not actually rely on the misstatements in purchasing the stock. *See, e.g., Basic Inc. v. Levinson*, 485 US 243, 247, 108 S Ct 978, 99 L Ed 2d 194 (1988). That doctrine, too, is unavailable to plaintiffs here.

Having concluded that reliance on Farmers's representations cannot be presumed on these facts and is not "inherent" in the plaintiffs' purchase of insurance, I consider briefly what evidence might be sufficient to show reliance here and whether the record contains such evidence. The fraud cases discussed above tell us what ordinarily is required to prove reliance: in *Gardner*, that the misrepresentation "induced [plaintiff] to make the agreement," 280 Or at 671; in *Handy*, that plaintiffs "would not have purchased the property," absent the misrepresentation, 282 Or at 656. And that is the way reliance ordinarily is proved in cases ranging from common-law fraud to statutory class actions.

Here, one would expect plaintiffs to prove reliance by testifying that, had they known the truth about Farmers's PIP reimbursement policy, they would not have bought the policy—and that they would bolster those assertions by showing that, after they learned that Farmers had misrepresented its practices, they changed insurance companies. At the very least, a plaintiff would offer credible testimony that he or she was induced to take *some* action, or intentionally declined to take some action, because of Farmers's misrepresentations and that the action or omission caused harm to the plaintiff.

The record contains virtually no such evidence. Most of the six plaintiffs who testified explained the representations that Farmers made to them in a way that was inconsistent with the allegations in the complaint (and with plaintiffs' theory of the case). Strawn, for example, believed that

the policy would "pay for all the bills up to a year" and would pay "all [medical and hospital] expenses," even though a policy that complied with ORS 742.524(1)(a)—the policy the majority says plaintiffs thought they had, because of Farmers's representations—would only cover all "reasonable and necessary" expenses, rather than "all" expenses.[5] And Strawn certainly could not have relied upon those misrepresentations when he purchased his Farmers policy because he bought that policy in 1997, before Farmer instituted its eightieth percentile reimbursement plan.

Strawn did testify that the PIP benefit amount actually stated in the policy looked like it would "not go very far." But when asked what he did in reliance on that observation, Strawn said that if he had known about Farmer's reduction plan, he would have "gotten more coverage" because he knew medical bills can add up quickly. Plaintiffs' theory in this case, however, was not that the total amount of PIP benefits was too low—that amount was clearly set out in the policy and met statutory requirements—but rather that Farmers promised to pay all reasonable and necessary expenses incurred, up to the amount stated in the policy, when in fact it did not intend to do so. So, even if the jury believed Strawn when he said he would have gotten "more coverage" than the basic PIP amount, that testimony supports no allegation in the complaint. Strawn's testimony simply does not show any reliance on Farmers's misrepresentation that it would pay "all reasonable and necessary" PIP expenses.

Moreover, hard as it is to believe, even after some of Strawn's medical charges were denied because they exceeded the eightieth percentile, Strawn *continued to maintain his Farmers automobile insurance policy and still was insured by Farmers at the time of trial.* Similarly, plaintiff Weiss continued to be insured by Farmers, despite the fact that Farmers paid less for his PIP-related medical expenses than he thought they should. (Although several plaintiffs testified

---

[5] Similarly, Weiss testified that "[i]f I had known that my bills would not have been paid, I would not have gone to this doctor. I would have waited to find out if they were going to be paid * * *." Weiss, like Strawn, believed incorrectly that Farmers had promised to pay all PIP expenses in full. Weiss provided no evidence of any reliance on Farmers's misrepresentation as to how reasonable and necessary medical expenses would be calculated.

that they changed insurers after finding out about Farmers's reimbursement policy, the differing conduct of the named plaintiffs demonstrates that it was improper to allow the jury to infer reliance by all class members on the basis of that evidence.)

The six plaintiffs who testified expressed various degrees of dissatisfaction with Farmers's PIP reimbursement policy and some testified to efforts made by medical providers to recover unpaid fees from them. But there was virtually no testimony from any plaintiff that he or she received and read Farmers's misrepresentations *or that he or she took any particular action (or failed to take any particular action) in reliance* on those misrepresentations. Much less was there any evidence from which a jury could infer that the entire class of Farmers policyholders who made PIP claims relied on any misrepresentation.

Whatever the strength of plaintiffs' nonfraud claims—and of the other elements of plaintiffs' fraud claim—plaintiffs failed to offer sufficient evidence of reliance for the fraud claim to go to the jury.[6]

I dissent.

---

[6] Presumably because of the paucity of evidence of reliance, the lower courts never discussed any actual reliance, but presumed that reliance could be found because there was evidence of misrepresentation. When Farmers moved for a directed verdict on the fraud claim, based in part on lack of proof of reliance, the trial court simply ignored that element of the claim. "[T]here are omissions and nondisclosures of material fact that are involved here," the court stated, and "[L]ooking at plaintiffs' evidence in the light most favorable to plaintiffs, there were half-truths involved here, again, using the same standard which the jury could choose to believe the evidence. So the defendant's motion fails on that ground." Similarly, the Court of Appeals stated that, based on evidence of Farmers's misrepresentations, a jury could "reasonably infer that plaintiffs relied on Farmers's misrepresentation that it would pay reasonable and necessary PIP-related expenses when they continued to pay their premiums." *Strawn v. Farmers Ins. Co.*, 228 Or App 454, 471, 209 P3d 357 (2009). But the Court of Appeals pointed to no testimony or other evidence that any named plaintiffs, in fact, relied on Farmers's misrepresentation when they "continued to pay their premiums," and the court's holding—that reliance could be "inferred"—made such proof unnecessary. The majority's legal analysis is more plausible than that of the lower courts, but, for the reasons set out above, ultimately is not persuasive.